Filed 5/15/23  Salazar v. Whelan CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ROBERT SALAZAR et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> BRIAN WHELAN et al., <br><br> Defendants and Appellants. | F083825 <br><br> (Super. Ct. No. 21CECG02710) <br><br><br> **OPINION** |

APPEAL from an order of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Lewis Brisbois Bisgaard & Smith, Raul L. Martinez, David D. Samani and Alex A. Graft for Defendants and Appellants.

One and Joanna Ardalan for Plaintiffs and Respondents.

-ooOoo-

Defendants in this defamation suit appeal the trial court's order denying their special motion to strike plaintiffs' complaint under Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute.  Because the trial court incorrectly determined

---

[1]     All further statutory references are to the Code of Civil Procedure unless otherwise stated.

that defendants' speech was not protected activity under section 425.16, subdivision (e)(3), we reverse.

## FACTS AND PROCEDURAL HISTORY

Defendant Brian Whelan is an attorney based in Fresno, California, who was litigating two lawsuits on behalf of former employees of plaintiff Robert "Bobby" Salazar, a Central Valley restaurateur. While those employment suits were pending, Salazar and his companies (plaintiffs) brought the instant defamation suit against Whelan and his law firm (defendants) for, in Salazar's view, publicly and falsely accusing Salazar of orchestrating several retaliatory arson attacks against Whelan and two others involved in the employment lawsuits. Defendants responded by filing an anti-SLAPP motion to strike the complaint in its entirety, which the trial court ultimately denied.

Salazar's complaint alleges causes of action for defamation, false light, and intentional and negligent interference with prospective economic advantage—all arising from two sets of public statements by Whelan following the most recent arson incident. In the early morning hours of June 23, 2021, an unknown individual ignited and destroyed three cars belonging to the family of Whelan's client, Hilda Lopez, a former cook at one of Salazar's restaurants. Lopez had just sued Salazar and the restaurant (with Whelan's assistance) for alleged labor and employment law violations. In an effort to help his client and her family, on June 27, 2021, Whelan created a GoFundMe.com fundraising web page (the GoFundMe page) containing the first set of statements Salazar challenges in this suit.[2]

---

[2]     The complaint refers to the text of the GoFundMe page as a "Press Release" published in connection with a GoFundMe fundraiser. There is no allegation that Whelan "released" this text anywhere but on the GoFundMe page, however. We therefore refer to Whelan's statements on the GoFundMe page simply as "the GoFundMe page."

Plaintiffs attached to the complaint screenshots of the GoFundMe page, including the public comments and donation tallies. The fundraiser description, written by Whelan, reads in full:

> "**Help Lopez Family Get Wheels - Fire Bombing Victim**
>
> "FRESNO, CALIF. On June 17, 2021, Hilda Lopez, filed a lawsuit for wrongful termination and pregnancy discrimination against Bobby Salazar, owner of the restaurant Bobby Salazar's in Fresno's Tower District.
>
> "On Tuesday June 22, 2021, Mr. Salazar was personally served with the lawsuit. Less than nine hours later, while parked in front of their house, the three cars owned by Ms. Lopez and her family were blown up by fire bombs.
>
> "Ms. Lopez and her husband, who together have four children including their new baby, rely on vehicles to commute and make doctor's appointments. Now, the Lopez family does not have the resources to replace the blown-up cars nor the insurance coverage to cover full replacement.
>
> "The Lopez car-bombings are not the first incidents of fire-related crimes tied to legal actions against Mr. Salazar.
>
> "On May 20, 2020, assailants firebombed the car of another Bobby Salazar's employee who exposed a pay-for-testimony scheme organized by Mr. Salazar in an attempt to tamper with witnesses in a separate wrongful termination lawsuit.
>
> "Two months later, on Aug. 17, 2020, assailants attempted to fire-bomb the offices of the attorney (involved in both the Lopez lawsuit and the other wrongful termination lawsuit) with incendiary devices akin to a Molotov cocktail.
>
> "While the Fresno Police Department, Fresno Fire Department, Federal Bureau of Investigation, and [United States] Bureau of Alcohol, Tobacco, [ ] Firearms[, and Explosives] are engaged in investigations related to all three fire-bombing incidents, the Lopez Family is in real need of immediate help to replace their cars, and if enough money can be raised, to move to safety where they will not be victimized again."

The GoFundMe page also includes photographs of Lopez and the fire-damaged cars. The fundraiser raised $6,963 from 76 donors. Plaintiffs allege a reasonable person would understand the above text "to mean that [p]laintiffs had committed a crime, specifically by car-bombing cars of at least two people and attempting to bomb an attorney['s] office."

## Statements to the Press

According to the complaint, the GoFundMe page "caused a surge of media coverage," during which Whelan provided further comments, forming the second set of statements challenged in this suit. Plaintiffs attached to the complaint five online news articles from different outlets covering the attack on Lopez, her lawsuit, the series of arson incidents, and Whelan's theory that the attacks were all linked to Salazar. All of the articles feature various statements attributed to Whelan, but plaintiffs primarily object to the following one, which was repeated in similar form in each of the online news articles:

> " 'Just to be clear, I'm giving the facts as they exist and people can connect the dots for themselves.' … 'So the facts are, these series of events have taken place, associated with lawsuits that I'm involved in, and, most recently, the facts are that a lawsuit was filed and it was served on Mr. Salazar and within nine hours all three of the cars are blown up.' "

Whelan's other statements in the news articles largely mirror his statements on the GoFundMe page. We discuss certain additional examples of Whelan's statements to the press in the analysis below.

## Additional Background

In support of the anti-SLAPP motion, Whelan filed a declaration providing more background on the two arson incidents preceding the destruction of the Lopezes' cars. Regarding the May 2020 incident, Whelan averred that he had been representing another former Salazar employee, Rodrigo Tovar, in a separate employment lawsuit against Salazar and the same Salazar restaurant where Lopez had worked. In April 2020, a third

4.

former employee contacted Whelan to convey that Salazar had offered her a cash payment in exchange for giving false testimony against Tovar (Whelan's client) in the civil suit. That witness executed a declaration describing her interaction with Salazar, which Whelan then transmitted to his opposing counsel. About one month later, the would-be witness's car "exploded" while parked on the street outside her residence. Regarding the August 2020 incident at Whelan's own office, Whelan averred that someone had thrown "an accelerant or Molotov Cocktail" against the window of his office, using "a similar method" as employed in the "bombing" of the Tovar witness's car.

Whelan further averred that, as of October 14, 2021 (the date of his declaration), all three arson incidents were still under investigation by the Fresno Fire Department and other authorities; and that an investigator told him in reference to the Lopez incident that " 'Bobby Salazar clearly had someone do it, he didn't do it himself.' "

In opposition to the motion to strike, Salazar filed his own declaration averring that he had never, directly or indirectly, damaged the Lopezes' cars or the car of any former employee; nor did he cause a Molotov Cocktail to explode outside Whelan's office. Salazar described "a significant drop in sales" at his businesses, which he attributed to Whelan's false statements.

### *The Trial Court's Tentative and Final Rulings*

The trial court issued a tentative ruling on November 24, 2021, that would have granted defendants' motion. The tentative ruling reasoned both sets of statements had "some relation to judicial proceedings" by virtue of their "recitations of dates and occurrences in the various underlying actions" and therefore constituted protected activity under section 425.16, subdivision (e)(2) (section 425.16(e)(2)). The tentative ruling viewed plaintiffs as not meeting their subsequent burden to show a probability of prevailing on their causes of action.

However, after a hearing on the motion, the trial court issued a final ruling denying defendants' motion.  The trial court found that Whelan's statements were not protected activity under either of the asserted categories of protection.  First, the statements were irrelevant to proving or disproving the employment claims in the Lopez lawsuit and therefore were not made "in connection with an issue under consideration" in that proceeding.  (§ 425.16(e)(2).)  Second, Whelan's statements were not made "in connection with an issue of public interest," as provided in section 425.16, subdivision (e)(3) (section 425.16(e)(3)) because Salazar was not a public figure, and despite crime generally being a matter of public concern, there is no general right to "litigate in the press," and one cannot satisfy the first step of the anti-SLAPP statute by simply accusing the plaintiff of a crime.  The court therefore did not reach the second-step analysis of whether plaintiffs showed a probability of prevailing.  This appeal followed.  (See § 425.16, subd. (i) [authorizing immediate appeal under § 904.1].)

**DISCUSSION**

## I.      Governing Anti-SLAPP Law

The anti-SLAPP statute authorizes a special motion to strike any cause of action "arising from any act … in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue …, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."  (§ 425.16, subd. (b)(1).)  The statute dictates a two-step process whereby the movant must first make a threshold showing that the challenged causes of action arise from protected activity—that is, arise from "any act … in furtherance of the [movant]'s right of petition or free speech … in connection with a public issue."  (*Ibid*.; see *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619–620 (*Rand*).)  If the movant succeeds, then at the second step

6.

the nonmovant must demonstrate a probability of prevailing on the challenged cause of action, or else have it stricken.**3** (*Rand*, at pp. 619–620.)

To carry its burden at the first step, the movant must show the challenged causes of action arise from acts that come within one or more of the four categories of protected activity provided in subdivision (e) of section 425.16. (*Rand*, *supra*, 6 Cal.5th at p. 620.) Defendants here invoke the middle two categories of: "(2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law"; and "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." (§ 425.16, subd. (e).) If the movant fails to meet this threshold burden, the court denies the motion without addressing the second step. The Legislature enacted section 425.16 "to encourage continued participation in matters of public significance," and its text is to be "construed broadly" to that end. (§ 425.16, subd. (a).)

We review de novo a trial court's ruling to grant or deny an anti-SLAPP motion. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) Like the trial court, we "consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2).)

## II. Analysis

Defendants argue that the trial court should have found both sets of Whelan's statements to be protected activity under subdivision (e)(2) and (3) of section 425.16. We agree with the trial court that the challenged statements do not qualify under section 425.16(e)(2) because they were not made in connection with an issue under consideration by a court. However, Whelan's statements do qualify under

---

**3** We decide this appeal under the first step alone and therefore omit the standards governing the second step.

7.

section 425.16(e)(3) because they were nevertheless made in connection with an issue of public interest.**4**

## A. Not Protected Under Section 425.16(e)(2)

Section 425.16(e)(2) protects "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law." Defendants invoke protection under section 425.16(e)(2) on the grounds that Whelan's statements were made in connection with the Tovar and Lopez lawsuits.**5** Citing the "expansive view" courts have taken of what constitutes litigation-related activities under section 425.16(e)(2) (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 908), defendants argue that the conduct at issue need only bear " 'some relation' " to judicial proceedings to warrant anti-SLAPP protection, language they cite from *Healy v. Tuscany Hills Landscape & Recreation Corp.* (2006) 137 Cal.App.4th 1, 5 (*Healy*). Defendants contend the trial court applied section 425.16(e)(2) too narrowly by requiring that

---

**4**     All of plaintiffs' causes of action certainly "aris[e] from" Whelan's public statements. (§ 425.16, subd. (b)(1).) The only debate is whether those public statements come within subdivision (e)(2) or (3) of section 425.16.

**5**     At oral argument, defendants proposed an additional ground for protecting Whelan's statements, arguing that because the arson incidents were being investigated by police and other authorities, Whelan's statements were made in connection with an issue under consideration in an "official proceeding authorized by law." (§ 425.16(e)(2).) Defendants did not present the governmental investigations as a basis for protection under section 425.16(e)(2) at the first step of the anti-SLAPP analysis, either in the trial court or in their briefing of this appeal. Defendants only invoked the presence of governmental investigations in aid of their *second*-step argument that plaintiffs could not prevail on their claims because Whelan's statements enjoyed absolute privilege under the fair reporting privilege. (See Civ. Code, § 47, subd. (d)(1) [privileging "fair and true" reporting in or to a public journal about, inter alia, a judicial, legislative, or "other public official proceeding"]; *Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337 [stating in dictum that a " 'public official proceeding' includes a police investigation"].) Accordingly, we do not consider this forfeited argument for protection under section 425.16(e)(2). (See *Applied Materials v. Workers' Comp. Appeals Bd.* (2021) 64 Cal.App.5th 1042, 1080, fn. 16 [courts of appeal disregard new arguments raised for the first time at oral argument, as unbriefed issues are forfeited].)

Whelan's statements have some relevance to proving or disproving the allegations in Lopez's employment lawsuit in order to qualify. According to defendants, "[r]elevance to the claims is not the test."

Our Supreme Court's decision in *Rand*, *supra*, 6 Cal.5th 610 demonstrates that defendants are mistaken. In *Rand*, the Supreme Court emphasized the statutory requirement that the communication be connected to " '*an issue*' " under consideration or review in an official proceeding. (*Id.* at p. 620, quoting § 425.16(e)(2).) These terms in section 425.16(e)(2) "make clear that 'it is insufficient to assert that the acts alleged were "in connection with" an official proceeding.' (*Paul v. Friedman* (2002) 95 Cal.App.4th 853, 867.) Instead, '[t]here must be a connection with an issue under review in that proceeding.' " (*Rand*, at p. 620.) *Rand* involved an issue under consideration by a legislative, not a judicial, body: a city council deciding whether to renew its contract with an agent to negotiate with the NFL about building a football stadium in their city. (*Id.* at pp. 614–615, 623.) Nevertheless, its parsing of the statutory text clarifies how section 425.16(e)(2) should apply in the judicial context as well. The Supreme Court held that "[o]nly communications made in connection with the renewal of the [exclusivity agreement]—*what the City Council actually considered*—constitute 'written or oral statement[s] or writing[s] made in connection with an issue under consideration or review' by the City Council. (§ 425.16, subd. (e)(2).)" (*Id*. at p. 623, italics & first & second bracketed insertions added.) "Statements concerning *anything else at issue* in these claims, including those reflecting or concealing a breach of the [agreement]'s exclusivity provision, fall outside the scope of this subdivision." (*Ibid*., italics added.)

Transposed into a judicial context, this means that protection applies only to communications made in connection with an issue that a court has actually considered or will actually consider in the proceedings. Indeed, the Supreme Court drew its analysis from a judicial proceedings case, *Paul v. Friedman*, *supra*, 95 Cal.App.4th 853, which rejected the idea that "*any* conduct in connection with an official proceeding" warrants

9.

protection. (*Id.* at p. 866.) "The statute does not accord anti-SLAPP protection to suits arising from any act having any connection, however remote, with an official proceeding. The statements or writings in question must occur in connection with 'an issue under consideration or review' in the proceeding." (*Ibid.*) The Supreme Court's adoption of *Paul v. Friedman*'s holding that the communication must be connected to *an issue* in the given proceeding, not merely connected to the proceeding, means that simply showing " ' "some relation" ' to judicial proceedings" (*Healy*, *supra*, 137 Cal.App.4th at p. 5) is not enough.

*Healy* pulled the "some relation" phrase from the Supreme Court's decision in *Rubin v. Green* (1993) 4 Cal.4th 1187, a case involving the litigation privilege codified in section 47, subdivision (b) of the Civil Code (Civil Code section 47(b)). In *Rubin*, the Supreme Court observed that "[f]or well over a century, communications with 'some relation' to judicial proceedings have been absolutely immune from tort liability *by the privilege codified as* [*Civil Code*] *section 47(b)*." (*Rubin*, at p. 1193, italics added.) But, first, the bounds of the Civil Code section 47(b) litigation privilege are not coextensive with the bounds of section 425.16(e)(2) (*Flatley v. Mauro*, *supra*, 39 Cal.4th at pp. 323–325), and, second, the "some relation" standard is not actually as broad as it sounds.

The communications at issue in this case would not qualify under the "some relation" standard applied in *Healy* and its predecessors. *Healy* afforded section 425.16(e)(2) protection to an informational litigation update letter not simply because the letter mentioned the litigation in question but also because the homeowner association's attorney had sent the letter *to members of the association*—persons with an interest in the litigation. (*Healy*, *supra*, 137 Cal.App.4th at pp. 5–6.) The same cannot be said of Whelan's statements, which were not directed to any defined group of people.

Expressly drawing on *Healy*'s reasoning, the now predominant section 425.16(e)(2) test for cases involving judicial proceedings is that a communication is " ' "in connection with" ' " litigation "if it relates to the substantive issues in the

10.

litigation and is directed to persons having some interest in the litigation." (*Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 962; see *Neville v. Chudacoff* (2008) 160 Cal.App.4th 1255, 1266; *id.* at p. 1264 [discussing *Healy*]; *Contemporary Services Corp. v. Staff Pro Inc.* (2007) 152 Cal.App.4th 1043, 1055, quoting *Healy*, *supra*, 137 Cal.App.4th at pp. 5–6.) This test reflects the fundamental principle of litigation privilege doctrine that the privilege " 'does not encompass publication to the general public through the press,' " covering only communications to those with a substantial interest in the proceedings. (*GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 153 (*GetFugu*).)

Applying that test here reveals Whelan's public statements were not made in connection with any issue under consideration by a judicial body. Although the GoFundMe page referenced Lopez's recently filed lawsuit and alluded to Tovar's earlier suit, it did not say anything about the substantive issues—the labor and employment claims—in either of those litigations. Further, Whelan's statements on the GoFundMe page were not directed to anyone in particular—much less anyone with a substantial interest in either lawsuit. They were broadcasted to the general public online, and then further republished "to the general public through the press." (*GetFugu*, *supra*, 220 Cal.App.4th at p. 153.) Under these circumstances, we cannot say that Whelan's statements were made in connection with an issue in either of the then-pending judicial proceedings.[6]

We reject defendants' implied argument that because Whelan's statements related to suspected witness intimidation efforts—which "would be issues of great interest" to the courts handling Lopez's and Tovar's cases—they necessarily related to an issue under

---

[6] During the pendency of this appeal, both Tovar's and Lopez's suits were dismissed, with prejudice, at their request in July and September 2022, respectively. (*Tovar v. Olive/Broadway Enterprises, Inc.* (Super. Ct. Fresno County, 2022, No. 20CECG00579); *Lopez v. Olive/Broadway Enterprises, Inc.* (Super. Ct. Fresno County, 2022, No. 21CECG01746).)

11.

consideration by the court. There is no indication that, at the time Whelan launched the GoFundMe page for Lopez in June 2021, the arson incidents were underlying any issue actually before the court in either the Lopez or Tovar case. Defendants point to their filing of an August 20, 2020 opposition to Salazar's discovery motion in the Tovar matter, in which they advised the court of the arson attacks on Whelan and the would-be witness. Defendants supply no procedural history of the Tovar lawsuit and no reason to think the Tovar court was pondering an issue involving the arson attacks for the better part of a year—through June 2021 when Whelan made the statements in question. On the contrary, the public docket reflects that the court denied (on procedural grounds) the referenced discovery motion on August 21, 2020, the day after defendants filed their opposition. (*Tovar v. Olive/Broadway Enterprises, Inc.* (Super. Ct. Fresno County, 2022, No. 20CECG00579).) There is no suggestion that Lopez ever informed her court of the arson attack on her family's cars. Thus, Whelan was not communicating about an issue presently, if ever, under review by a judicial body.

We also reject defendants' attempt to analogize this case to *Dziubla v. Piazza* (2020) 59 Cal.App.5th 140. *Dziubla*, which involved a fundraising plea posted on the defendant's business website and e-mailed to his business's 200,000 members, reaffirms the well-established proposition that communications asking *interested persons* to contribute funds *toward pending litigation* are protected under section 425.16(e)(2). (*Dziubla*, at pp. 146, 150; see *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 821–822 [holding statements made "in the context of exhorting shorthand reporters to contribute to the cost of pursing th[e] litigation" challenging shorthand reporters' direct contracting practices were made in connection with that litigation], disapproved on other grounds by *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5.) It does not mean that all fundraising messages that mention pending litigation are protected. Unlike the *Dziubla* defendant's message to his business's membership, Whelan's message on the GoFundMe page was not sent to anyone with a particular

12.

interest in Lopez's employment suit; it was merely posted online. Further, the only stated purpose of the GoFundMe page was to raise money for the Lopez family to replace their destroyed cars, and possibly move to a safer residence. There was no exhortation of others, much less *interested* others, to contribute to the cost of Lopez's *lawsuit*. (Cf. *Dziubla*, at p. 150 [noting the statement's "primary purpose seems to be explaining the litigation to Front Sight's members and asking for their financial help" in " 'prosecuting our lawsuit against [Dziubla]' "]; *Wilcox*, at pp. 821–822 [statements made "in the context of exhorting [others] to contribute to the cost of pursing th[e] litigation"].)

Thus, Whelan's statements do not satisfy the prevailing test for protection under section 425.16(e)(2); nor do they satisfy the "some relation" standard as applied in the cases on which defendants rely. To the extent defendants urge a more generalized "some relation" standard than that applied in the litigation privilege context, *Rand* precludes us from adopting such a loose standard for section 425.16(e)(2) given its textual requirement of a connection to " '*an issue*' " under consideration or review in an official proceeding. (*Rand*, *supra*, 6 Cal.5th at pp. 620, 623.)

### B. Protected Under Section 425.16(e)(3)

Turning to the other category defendants invoke, section 425.16(e)(3) protects "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." Plaintiffs judiciously do not dispute that Whelan's statements were made in a "public forum" or a "place open to the public" within the meaning of section 425.16(e)(3). (See *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138, 1146 ["[t]he Internet is a classic public forum which permits an exchange of views in public"]; *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1038–1039 [newspapers and magazines, including online newspapers, are public fora for purposes of § 425.16(e)(3)].) Therefore, the only question is whether Whelan's statements were made "in connection with an issue of public interest." (§ 425.16(e)(3).)

13.

The phrase "issue of public interest" also appears in section 425.16's so-called catchall subdivision (e)(4), which protects "any other conduct … in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).) Despite section 425.16, subdivision (e)(4)'s disjunctive use of the terms "public issue" or "issue of public interest," courts have treated them as substantively the same. (See *Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119 (*Du Charme*) [applying a single standard to "the public issue/issue of public interest requirement of section 425.16, subdivision (e)(3) and (4)"]; *Scott v. Metabolife Internat., Inc.* (2004) 115 Cal.App.4th 404, 420, fn. 5 [noting decision to use "issue of public interest" to refer to both concepts together]; see also *Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 22 (*Bernstein*) [analyzing § 425.16, subd. (e)(3) & (4) under a single standard]; *Price v. Operating Engineers Local Union No. 3* (2011) 195 Cal.App.4th 962, 972–974 [same].) Defendants cite no authority for their single-sentence argument in their reply brief and repeated at oral argument, that an "issue of public interest" is broader than a "public issue." We have found no precedent treating these concepts as distinct, and we decline to rest our decision on an arguable difference between these twin phrases in the absence of fulsome briefing on the subject. Accordingly, this opinion follows the precedent treating them as one and the same.

To determine whether a statement was made "in connection with a public issue or an issue of public interest" for purposes of section 425.16, subdivision (e)(3) and (4), we must ask two questions: First, what public issue or issue of public interest, if any, does the challenged speech implicate? Second, looking to the "functional relationship" between the speech and the issue to ensure an adequate connection, does the speech " 'contribute to the public debate' " of the issue? (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 149–150 (*FilmOn*); see *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 (*Geiser*) [condensing the *FilmOn* test].)

14.

With respect to the first question, the statute does not define the terms "public issue" or "issue of public interest." However, our Supreme Court has approved the guiding characteristics identified by the Courts of Appeal in *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*), and *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*). (*Geiser*, *supra*, 13 Cal.5th at p. 1248; *FilmOn*, *supra*, 7 Cal.5th at p. 149.) In *Rivero*, the court distilled "three nonexclusive categories of public interest" (*FilmOn*, *supra*, 7 Cal.5th at p. 149): Statements concerning (1) "a person or entity in the public eye," (2) "conduct that could directly affect a large number of people beyond the direct participants," or (3) "a topic of widespread public interest." (*Rivero*, at p. 924.) Like the anti-SLAPP statute overall, the "scope of the term 'public interest[]' is to be construed broadly." (*Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 674; *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695 [noting the "exceedingly 'expansive interpretation of the phrase "issue of public interest" ' "].)

*FilmOn*'s first question requires "an objective inquiry, without deference to the movant's framing or personal motivations," although those components may inform the analysis if objectively reasonable. (*Geiser*, *supra*, 13 Cal.5th at p. 1254.)[7] The first

---

[7] The California Supreme Court issued the *Geiser* decision on August 29, 2022, after defendants filed their opening brief and three months before plaintiffs filed their responsive brief. Thus, defendants only discuss *Geiser* for the first time in their reply brief. To the extent plaintiffs might complain this deprived them of the opportunity to address *Geiser*, we note that plaintiffs could have proactively addressed *Geiser* in their responsive brief and did not request the opportunity to submit a sur-reply brief. In any event, *Geiser* largely reiterates the prevailing standards while clarifying that (a) context factors into both phases of the "public issue" analysis and (b) the first question requires no deference to the movant's framing. (*Geiser*, *supra*, 13 Cal.5th at pp. 1252–1254, 1256.) We reject defendants' argument that *Geiser* "relaxed the requirements to satisfy the 'public interest' aspect of the anti-SLAPP statute" by recognizing that a dispute's private nature does not preclude the challenged speech from also implicating a public issue. Anti-SLAPP cases have long recognized that protection extends to speech implicating dual private/public interests. (See, e.g., *Chaker v. Mateo*, *supra*, 209 Cal.App.4th at p. 1145 [citing cases "emphasiz[ing] that the public interest may extend to statements about conduct between private individuals"]; *Weinberg*, *supra*, 110 Cal.App.4th at p. 1132 [discussing

15.

question is satisfied "so long as the challenged speech or conduct, considered in light of its context, may reasonably be understood to implicate a public issue, even if it also implicates a private dispute." (*Geiser*, at p. 1253.) "If a reasonable inference can be drawn that the challenged activity implicates a public issue, then the analysis proceeds to *FilmOn*'s second step." (*Id.* at p. 1254.)

*FilmOn*'s second question "moves from a focus on identifying the relevant matters of public interest to addressing the specific nature of defendant[s'] speech and its relationship to the matters of public interest." (*FilmOn*, *supra*, 7 Cal.5th at p. 152; see *id.* at p. 150 [requiring " 'some degree of closeness' between the challenged statements and the asserted public interest"].) What it means to "contribute to the public debate" (*id.* at p. 150) will differ from case to case, but we are looking for a defendant to have "participated in, or furthered, the discourse that makes an issue one of public interest" (*id.* at p. 151). The context of the speech plays an equally important role as its content and must be considered during both *FilmOn*'s first and second questions. (*Geiser*, *supra*, 13 Cal.5th at p. 1256.) Contextual considerations include "the identity of the speakers or participants," the activity's "location and audience," and its "purpose and timing." (*Id.* at p. 1253; see *FilmOn*, at p. 152.)

Ultimately, the goal is to confer anti-SLAPP protection only where doing so would "encourage continued participation in matters of public significance." (§ 425.16, subd. (a); see *FilmOn*, *supra*, 7 Cal.5th at p. 154.)

1. First Question: Issue of Public Interest

We have little trouble concluding that both sets of Whelan's statements—those on the GoFundMe page, and those made to the media—can reasonably be understood to implicate a public issue or an issue of public interest. (See *Geiser*, *supra*, 13 Cal.5th at

"attributes of the issue which make it one of public, rather than *merely* private, interest" (italics added)].) *Geiser* simply illustrates that existing principle.

16.

p. 1253.) We agree with defendants that Whelan's statements on the GoFundMe page, although primarily concerned with raising funds for the Lopez family (a private interest), also implicated the eminently public issue of combatting a perceived pattern of witness intimidation and retaliation against individuals pursuing legal claims in court.[8] (See *Geiser*, at p. 1253 [first question is satisfied if challenged speech reasonably implicates a public issue, "even if it also implicates a private dispute"].)

Looking at the language of the GoFundMe page, Whelan couched the Lopez family's need for funds in terms of them being the most recent victims of a spate of arson attacks on individuals involved in litigation adverse to Salazar's interests. Whelan expressly situated the Lopezes' misfortune as part of a series of "fire-related crimes tied to legal actions against Mr. Salazar," including the May 2020 effort to "tamper with witnesses" in another wrongful termination lawsuit, and the August 2020 attack on the offices of the attorney involved in both lawsuits.[9] There would be no need to detail the earlier two attacks if the only interest being served by the fundraiser was the Lopezes' personal need of funds to buy replacement cars. That was undisputedly one of the aims of the GoFundMe page, but another goal was just as readily discernable: helping to thwart the ostensible efforts of the "assailants" to deter workers from bringing claims against Salazar in court. By describing three apparently retaliatory arson incidents in the Fresno area in just slightly over a year, Whelan's GoFundMe page clearly implicated an

---

[8]    We wish to emphasize that no part of this opinion should be construed as a finding that Salazar in fact had anything to do with any of the arson incidents that Whelan believes are linked to him. We acknowledge plaintiffs' highlighted evidence (a declaration by unaffiliated former opposing counsel of Whelan's) that around August 2020, Whelan accused *another* litigation opponent of being responsible for causing a Molotov Cocktail to explode outside Whelan's office and for "car-bomb[ing]" the vehicle of another of Whelan's clients. In this appeal, we address only whether Whelan's speech was protectable under the anti-SLAPP statute—not the truth of Whelan's statements or implied statements of fact.

[9]    Although the GoFundMe page names defendant "Brian Whelan" as the fundraiser's organizer, the page does not identify Whelan as the attorney for Lopez or Tovar.

17.

issue of public interest, as this was "conduct that could directly affect a large number of people beyond the direct participants." (*Rivero*, *supra*, 105 Cal.App.4th at p. 924.) Whelan was describing a pattern of *public* acts of violence by fire, referring to the destruction of the Lopezes' cars "while parked in front of their house" and the attack on "the offices" of the attorney. Although not stated in the GoFundMe page, Whelan's declaration averred that the arson attack on the Tovar witness's car occurred while the car was "on the street" outside the witness's residence. Fire, by its nature, can easily spread to harm people and property beyond its intended targets. (Cf. *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 382 [location of registered sexual offender would be of interest to most people, especially those living in the area].) And, even aside from this potential for indiscriminate physical harm, the entire Fresno community would be affected by organized efforts to silence those who try to participate in the judicial process.

Moreover, in this particular instance, Whelan's solicitation of financial assistance to help Lopez with her private dispute would be reasonably understood as, itself, a call to combat the public issue of retaliation against those who file suit. Two of the three public donor comments displayed on the GoFundMe page reference a hope for "justice" for Lopez, suggesting a belief that their donations would empower her to continue litigating her case despite the arson attack. Thus, even assuming the GoFundMe page was primarily directed to raising money for Lopez, that purpose was in service of a broader public interest in supporting the pursuit of legal redress in the face of suspected extrajudicial retaliation.

Considering the context of the GoFundMe page statements—the "audience, speaker, and purpose" (*FilmOn*, *supra*, 7 Cal.5th at p. 152)—reinforces our conclusion that they implicate a public issue. Whelan's audience was the public at large, anyone who might consider donating to the Lopezes' cause; it was not a private communication. True, the speaker, Whelan, had a personal interest in the fundraiser, as Lopez's attorney and as a victim of previous perceived retaliation—and in tarnishing Salazar's reputation,

18.

as his litigation opponent. However, Whelan was also a member of the Fresno community and an officer of the court, giving him a simultaneous interest in ensuring access to justice for all. As to purpose, Whelan's declaration in support of the motion to strike conveyed his "concern at the time—and still today—is that these [arson attacks] are part of a pattern of conduct by some person or persons aimed at intimidating litigants and witnesses from exercising their right to seek legal redress which may be adverse in some fashion to Salazar." Because these motivations are objectively reasonable and reflected in the statements themselves, they inform our analysis of the first question. (See *Geiser*, *supra*, 13 Cal.5th at p. 1254.)

The content of Whelan's statements reported by the various online news outlets does not substantively differ from that of his statements on the GoFundMe page. Given their context, however, those statements even more clearly implicate a public issue or an issue of public interest. Three of the five articles attached to the complaint bear titles highlighting Whelan's allegations that the arson attacks were retaliation for claims against Salazar. The articles each chronicle all three arson incidents and only briefly mention a fundraiser being started for Lopez. The article on GVWire.com (titled " 'Fire-Bomb' Attacks Linked to Claims Against Fresno Restaurateur, Attorney Alleges") includes comments from Whelan such as, " 'I hope the community will join me in supporting a hardworking neighbor who is trying to do the right thing,' " referring to Lopez, and, " 'A particular brand of intimidation has emerged when it comes to seeking justice with Bobby Salazar.' " Whelan's statements for these articles clearly implicate the public issue of combatting perceived witness and litigant intimidation.

The trial court never attempted to identify what public issue might be implicated by Whelan's statements, beyond observing that a defendant cannot satisfy the first step of the anti-SLAPP statute by simply claiming that the plaintiff was accused of a crime. That is true as a matter of law (see *Weinberg*, *supra*, 110 Cal.App.4th at p. 1134), but defendants never argued that the issue of public interest was Salazar's implied

19.

orchestration of criminal acts. Rather, they argued "access to justice and instances of witness tampering or intimidation are of serious public concern." We agree that, broadly construed, these are issues of public interest implicated by both sets of Whelan's statements. (See *Brodeur v. Atlas Entertainment, Inc.*, *supra*, 248 Cal.App.4th at p. 674.)

2. Second Question: Contribution to the Public Debate

Whether Whelan's statements satisfy *FilmOn*'s second question is a closer issue. Defendants maintain their argument asserted below that Whelan's statements "expressly further[ed] the dialogue on [the above] issue[s], bringing attention to incredibly concerning occurrences demonstrating a potential pattern of harassment." Plaintiffs counter that Whelan was simply raising money for the Lopezes to replace their cars and "litigating in the press" to gain an advantage in the then-pending lawsuits by Tovar and Lopez.

In denying defendants' anti-SLAPP motion, the trial court was apparently swayed by plaintiffs' view, noting that "there is no general right to litigate in the press." However, again, this correct statement of law is out of place, as it does not bear on defendants' ability to satisfy the first step of the anti-SLAPP analysis.

The rule against extending protection for "litigating in the press" applies in assessing claims of litigation privilege under Civil Code section 47(b), not in assessing whether speech constitutes a protected activity under section 425.16, subdivision (e)(3) and (4). Both of the cases on which the trial court relied address the issue of "litigating in the press" in the context of a defendant's assertion of absolute privilege under Civil Code section 47(b). (See *GetFugu*, *supra*, 220 Cal.App.4th at p. 154 [concluding that attorney's press release and Tweet were "not shielded by the litigation privilege"]; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1149 ["hold[ing] that the litigation privilege should not be extended to 'litigating in the press' "].) The litigation privilege provides absolute immunity for statements made "in the course of a judicial or quasi-judicial proceeding to achieve the objects of the litigation" (*Rothman*, at p. 1140) in order

20.

to encourage aggrieved parties to "use the courts, rather than self-help, to obtain relief" (*id*. at p. 1146). It would be contrary to that purpose to privilege "a press release trumpeting one party's version of a legal dispute." (*Id.* at p. 1142.) The same policy underlies the rule, referenced above in the discussion of section 425.16(e)(2) that the litigation privilege does not apply to communications to the general public—only communications to those with a substantial interest in the proceedings. (*Rothman,* at p. 1143; *GetFugu*, at p. 152.)

While we fully endorse this anti-mudslinging policy when it comes to claims of absolute immunity, it should not be used to prevent defendants from making their threshold showing under section 425.16, subdivision (e)(3) and (4) of the anti-SLAPP statute. Those categories of protection *require* the movant to demonstrate their challenged speech or other conduct was connected with "a public issue" or "an issue of public interest." (§ 425.16, subd. (e)(3), (4).) When issues of public interest are involved, statements to the general public—either through press releases or the internet and social media—are not uncommon. (See, e.g., *Pott v. Lazarin* (2020) 47 Cal.App.5th 141, 148–149 [press conference and Facebook posts]; *GetFugu*, *supra*, 220 Cal.App.4th at pp. 145–146, 151 [press release and Tweet].) Sometimes, as here, those public statements are made by an individual who is already involved in litigation against the person or entity implicated in those public statements. (See *GetFugu*, at pp. 145–146, 151 [press release and Tweet about investment scam concerning a public company that the defendants were suing].) It would unjustly penalize such speakers for courts not to let them get a foot in the anti-SLAPP door just because their public speech can be understood to negatively impact a litigation opponent. At the first step of the anti-SLAPP analysis for section 425.16, subdivision (e)(3) and (4), the question is simply whether the movant was speaking in connection with a public issue or an issue of public interest. It is not dispositive that the challenged speech negatively implicated a party opponent such that it might constitute "litigating in the press." Of course, the litigation privilege may be

foreclosed to such a speaker if asserted at the second step of the anti-SLAPP analysis (assessing the plaintiff's probability of prevailing on the merits); but that speaker should not be automatically prevented from at least reaching the second step.

Thus, in *GetFugu*, the moving attorney defendants made their threshold showing under section 425.16, subdivision (e)(3) and (4) despite their press release and Tweet publicizing the "alleged misdeeds" of the plaintiffs, whom they were suing in a separate case. (*GetFugu*, *supra*, 220 Cal.App.4th at pp. 151, 153.) The court expressed no qualms about the defendants "litigating in the press" until holding *at the second step* that the communications were not shielded by the litigation privilege because they were disseminated to the general public. (*Id.* at pp. 153–154.)

The litigation privilege is concerned with protecting the use of the judicial process to resolve disputes; hence, its distaste for public speech that might taint that process. Section 425.16, subdivision (e)(3) and (4) are concerned with protecting those who speak on public issues and "encourag[ing] continued participation in matters of public significance." (§ 425.16, subd. (a).) Unlike Civil Code section 47(b), section 425.16, subdivision (e)(3) and (4) thus embrace—rather than shun—public speech, even when that speech implicates participants in separate ongoing litigation (so long as it also implicates an issue of public interest). To the extent the trial court denied defendants access to anti-SLAPP protection under section 425.16(e)(3) because Whelan's statements could be construed as litigating in the press, it erred.

We proceed to analyze the second *FilmOn* question, assessing the "functional relationship" between Whelan's speech and the matters of public interest, factoring the presence of ongoing litigation as just one of the many contextual considerations—not as an automatic disqualification. (*FilmOn*, *supra*, 7 Cal.5th at pp. 149–150.) On balance, we conclude there was an adequate " 'degree of closeness' " between Whelan's statements and the topics of access to justice, witness intimidation, and retaliation; and his statements " 'contribute[d] to the public debate' " of these issues. (*Id.* at p. 150.)

22.

Starting with "the specific nature of [Whelan's] speech" (*FilmOn*, *supra*, 7 Cal.5th at p. 152), we recognize that the GoFundMe page never expressly mentions "witness intimidation," "retaliation," or "access to justice." The GoFundMe page does reference an "attempt to tamper with witnesses," but even so, the fundraiser by its literal terms "did not seek public discussion of anything." (*Woodhill Ventures, LLC v. Yang* (2021) 68 Cal.App.5th 624, 627, 632–633 (*Woodhill Ventures*) [denying protection under § 425.16(e)(3) for social media posts about cake maker's overly realistic, pill-shaped decorations where the statements "did not discuss the danger of children confusing medications for candy" and "did not seek public discussion of anything"].) On the other hand, neither can the GoFundMe page fairly be described as "aimed to whip up a crowd for vengeful retribution," (*Woodhill Ventures*, at pp. 632–633) or as purely an effort " 'to gather ammunition for another round of [private] controversy' " (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1132–1133).

In *Woodhill Ventures*, the unhappy cake customer defendants posted vitriolic messages on social media vowing to make the bakery "FEEL IT" and to ensure no one they knew would ever "do[] business with idiots such as [the plaintiff's] business." (*Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 628.) The court reasoned that these postings "were not a discussion of anything. They were only a diatribe." (*Id.* at p. 635.) And " 'an attempt to exact a personal revenge' by causing others to ostracize the target is not a protected public interest statement." (*Ibid.*) Similarly, in *Weinberg*, a token collector who believed the plaintiff had stolen a valuable token "began a private campaign … to discredit [the] plaintiff in the eyes of a relatively small group of fellow collectors" by writing several letters to groups of collectors in an effort "to oust [the] plaintiff from the token collecting avocation." (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1128, 1135.) The court held that the defendant could not turn "what in effect was a private matter" into a matter of public interest just by accusing the plaintiff of criminal conduct (theft). (*Id.* at p. 1135.)

23.

By contrast, Whelan's GoFundMe page statements are measured in tone, as opposed to inflammatory (notwithstanding the repeated mentions of "fire bombing"), and do not call for any action to be taken against Salazar or the "assailants." Far from an angry diatribe seeking ostracism, the GoFundMe page reads as an informative community update aiming to raise awareness about a disturbing pattern and to help the victims of a devastating attack. Further, although not calling for a *literal* discussion of the public issues implicated, the request for money for the Lopezes can readily be construed as seeking public "participation" on the issue of combatting perceived retaliatory witness/litigant intimidation. (See § 425.16, subd. (a) [stating purpose "to encourage continued *participation* in matters of public significance" (italics added)].) As the adage goes, money talks. Readers of the GoFundMe page would readily understand that their contributions would show support for the Lopezes standing up to the attack and continuing to pursue their legal claims. Even if the direct purpose of the money was to replace the Lopezes' cars, the requested donations—which ultimately came from 76 supporters—were also a demonstration of community resolve in the face of perceived whistleblower retaliation.

Whelan did not need to use the words "witness intimidation," "retaliation," or "access to justice" to convey to readers that these were the issues of concern. By discussing all three arson incidents and their common connection to litigation adverse to Salazar, Whelan was bringing to light his theory that a nefarious pattern was emerging.

Whelan's essentially contemporaneous statements to the media make explicit his purpose for speaking out and starting the fundraiser. It is worth repeating Whelan's statements reported in GVWire.com: " 'I hope the community will join me in supporting a hardworking neighbor who is trying to do the right thing,' " referring to Lopez, and, " 'A particular brand of intimidation has emerged when it comes to seeking justice with Bobby Salazar.' " Like his commentary on the GoFundMe page, Whelan's statements to the press were not limited to describing the Lopez attack. He provided details of the two

24.

prior arson incidents, consistently situating the Lopez attack as "not the first" suspicious fire targeting participants in litigation against Salazar. Whelan's consistent discussion of the pattern of arson incidents within a little over a year convinces us that "the focus of [his] conduct [was] the public interest rather than a mere effort 'to gather ammunition for another round of [private] controversy.' " (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1132–1133, third bracketed insertion in original.) Whatever arguably private dispute Lopez and Salazar may have had regarding her employment at his restaurant turned public when she was targeted by an act of public violence within a few days of filing her lawsuit and not long after similar arson attacks on others working against Salazar's interests. Whelan's statements about these suspicious fires were closely connected to rallying community awareness and action to not let any perceived intimidation efforts succeed.

Turning back to the context, both sets of statements were intended to and did enter the public sphere by virtue of Whelan posting them on the internet where they garnered nearly 100 "followers" of the campaign and immediate media attention. (Cf. *FilmOn*, *supra*, 7 Cal.5th at p. 153 [in rejecting anti-SLAPP protection on second question, reasoning that the defendant issued its reports "not to the wider public … but privately, to a coterie of paying clients," therefore intentionally never entering the public sphere].) This is not to say that any online posting is automatically about an issue of public interest. (See *Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 633; *D.C. v. R.R.* (2010) 182 Cal.App.4th 1190, 1226.) However, audience matters; and broadly distributing a message weighs in favor of finding the message contributed to the public discourse.

Another factor in favor of finding Whelan's statements furthered public debate of the public issues is the significant media attention given to them. Plaintiffs themselves allege that the GoFundMe page "caused a surge of media coverage," exemplified by the five online news articles in the record from different outlets covering the arson incidents, published over the four days following the fundraiser's launch. "[W]hen the conduct that

gives rise to a lawsuit attracts such media attention, it can be an indicator that such conduct was undertaken 'in connection with' a public issue." (*Geiser*, *supra*, 13 Cal.5th at p. 1255; see *id.* at pp. 1244–1245, 1255 [noting that "the media coverage arising from the controversy," consisting of articles in three news outlets, bolstered the conclusion that the defendants satisfied *FilmOn*'s second question].) We view the media coverage to be such an indicator in this case. The fact that at least five media sources found Whelan's GoFundMe page statements newsworthy—and rebroadcast them in a light that emphasized not only the Lopezes' plight but also the pattern of retaliation suspected by Whelan—shows that Whelan's original statements furthered public awareness and discussion of both topics.

Further indication that Whelan's statements promoted public participation on the issue of combatting perceived retaliation can be found in Salazar's allegations and declaration describing a resulting loss of business. According to the complaint, the GoFundMe page "caused a substantial drop in restaurant tickets and salsa sales,"[10] and "[r]egular customers have boycotted [p]laintiffs' businesses because of [d]efendants' false statements of fact." In his declaration in opposition to the motion to strike, Salazar described "a significant drop in sales" at his businesses, which he attributed to Whelan's statements. Although the record lacks any specifics on the degree of economic impact, customers "boycott[ing]" plaintiffs' businesses and causing "substantial" loss of business strongly suggests that the public was moved to action by Whelan's statements. Again, the fact that the resulting action was demonstrative (taking one's business elsewhere)

---

[10] In addition to owning six Mexican restaurants, Salazar also owns a company that produces and sells a line of Mexican salsas. We presume "restaurant tickets" is a reference to customer food orders.

26.

rather than verbal (speaking at a town hall or community forum) does not lessen the level of community participation apparently achieved by the statements.[11]

Plaintiffs argue that Whelan should not be permitted to make a public issue out of unfounded accusations against Salazar just by making them. This raises a legitimate concern, reflected in much of the anti-SLAPP case law, that there be "an ongoing controversy, dispute or discussion" regarding the asserted public issue(s) at the time of the challenged speech in order for the speech to qualify as protected activity. (*Du Charme*, *supra*, 110 Cal.App.4th at p. 119; see, e.g., *Bernstein*, *supra*, 43 Cal.App.5th at p. 22.) The purpose of this requirement is to ensure that courts protect only speech (or other conduct) that serves the statutory prerogative of encouraging "participation" in matters of public significance. (§ 425.16, subd. (a).)

*Du Charme*, *supra*, 110 Cal.App.4th 107, illustrates how the "ongoing controversy" requirement operates to exclude speech made after a controversy has ended. There, the challenged speech—a statement on the union's website explaining that the plaintiff former union manager had been terminated for financial mismanagement—was held not protected because the termination "was a fait accompli; its propriety was no longer at issue. Members of the local were not being urged to take any position on the matter. In fact, *no* action on their part was called for or contemplated." (*Id.* at p. 118; see *id.* at pp. 113–114.) "To grant protection to mere informational statements, in this context, would in no way further the statute's purpose of encouraging *participation* in matters of public significance (§ 425.16, subd. (a))." (*Id.* at p. 118.)

*Bernstein*, *supra*, 43 Cal.App.5th 15, applied the "ongoing controversy" requirement to the earlier end of the timeline to deny protection to speech made before any controversy had arisen. In *Bernstein*, a bartender had refused to serve drinks to a

---

[11] Given the other factors showing that Whelan's statements were protected activity, we need not and do not decide whether his statements fall within the rubric of "consumer protection" information.

famous actor and his companion who appeared to be inebriated; the actor became belligerent and repeatedly shouted that the bartender was being a " 'Racist' " despite no indication that the actor or his companion's race played a role. (*Id.* at p. 19 & fn. 2.) When the bartender sued the actor over the incident, the actor filed an anti-SLAPP motion, arguing in part that his statements "addressed a matter of public interest because they contributed to the public debate on racism." (*Bernstein*, at p. 20.) The court flatly rejected this argument because there was "no evidence that [the actor]'s comments addressed an ongoing controversy or an issue that had garnered any public interest before [he] lashed out at [the bartender]." (*Id.* at p. 24.) This was "a purely private dispute that only drew media attention after it occurred." (*Id.* at p. 25.)

Here, too, there is no indication of any public discussion of witness/litigant retaliation or access to justice issues underway in Fresno at the time Whelan published the GoFundMe page. Still, this case does not implicate either of the concerns underlying the "ongoing controversy" requirement illustrated in *Du Charme* or *Bernstein*. Whelan's speech, which was calling for action (donations to support a victim of perceived retaliation) while all three arson incidents were still under investigation by authorities, did not constitute "mere informational statements." (*Du Charme*, *supra*, 110 Cal.App.4th at p. 118.) Far from being over, the public discussion (figuratively speaking) was just beginning. And even though Whelan's speech, itself, started the conversation—by publicizing his theory that all three arson incidents shared a common connection—it was not as though Whelan conjured the theory out of thin air, like the actor in *Bernstein*. The *Bernstein* court highlighted the absence of an ongoing controversy *before* the challenged statements by way of reinforcing its conclusion that it was "obvious from the circumstances" that the actor's " 'name calling' " statements during his "tantrum" "were not intended to further any public debate on the issue of racism." (*Bernstein*, *supra*, 43 Cal.App.5th at p. 24; see *ibid.* [noting the actor's statements "concerned an isolated

dispute" and the lack of record evidence that the bartender had been accused of engaging in racist behavior in the past].)

Here, although we do not know whether Whelan's theory is correct—that all three arson incidents were actually intended to deter those working against Salazar's interests—the record contains reasons to think it *might* be correct. At the time he made the challenged statements, it is likely Whelan was one of the few people, if not the only person, to be in a position to recognize the pattern that he was reporting. Therefore, the absence of a pre-existing public discussion about retaliation against anti-Salazar witnesses and litigants does not concern us. A public debate or controversy must start somewhere. We see no reason why anti-SLAPP protection cannot apply to the person who first reports the set of facts giving rise to a public controversy, so long as that report is not obviously fanciful and does actually lead to public discourse on the issue(s) reported.

That test is satisfied here because, after seeing a third arson attack within the space of about a year on individuals working against Salazar's interests, Whelan had at least some basis to believe this was a matter of public significance of which the community should be aware; and the community responded to his announcements by (a) covering them in the news, (b) contributing to Lopez, with the knowledge she was still pursuing her legal claims, and (c) taking their business away from Salazar. This is enough for us to conclude that Whelan's statements furthered public "participation" on the issue of combatting perceived retaliatory witness intimidation, in satisfaction of *FilmOn*'s second question.

We conclude that both sets of Whelan's statements were made in "a public forum in connection with an issue of public interest" and therefore constitute protected activity under section 425.16(e)(3).

29.

### C. Remand for Second-step Determination

Because the trial court reached the opposite conclusion, finding that defendants failed to carry their first-step burden, it did not address the second step of whether plaintiffs met their burden to show a probability of prevailing on the merits of their claims. Nor did the trial court rule on the admissibility of the parties' evidence, as to which numerous objections were lodged. "Under such circumstances, the more prudent course is to remand the matter to the trial court to determine in the first instance whether [plaintiffs] demonstrated a reasonable probability of prevailing on the merits of [their] causes of action." (*Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1527; see *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096, 1113 [following *Hunter*].) We do so now.

### DISPOSITION

The trial court's order denying defendants' motion to strike under section 425.16 is reversed. The matter is remanded to the trial court with directions to determine whether plaintiffs met their burden of demonstrating a probability of prevailing on the merits of their claims at trial.

Defendants are entitled to their costs on appeal. (See Cal. Rules of Court, rule 8.278(a)(2).)


                                                       HILL, P. J.

WE CONCUR:


LEVY, J.


SNAUFFER, J.