Filed 6/6/16  Certified for Publication 6/27/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PAUL BRODEUR,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ATLAS ENTERTAINMENT, INC., et al.,<br><br>    Defendants and Appellants. | B263379<br><br>(Los Angeles County<br>Super. Ct. No. BC562288) |

APPEAL from an order of the Superior Court for the County of Los Angeles. Terry Green, Judge.  Reversed.

Leopold, Petrich & Smith, Louis P. Petrich, Elizabeth L. Schilken and Eva S. Neuberg for Defendants and Appellants.

Davis Wright Tremaine, Kelli L. Sager, Jonathan L. Segal, and Thomas R. Burke, for CBS Broadcasting Inc., The Motion Picture Association of America, The New York Times Company, Getty Images (US), Inc., Hearst Corporation, First Look Media Works, Inc., Center for Investigative Reporting, Inc., The California Newspaper Publishers Association, First Amendment Coalition, Californians Aware, and The Reporters Committee for Freedom of the Press, as Amici Curiae on behalf of Defendants and Appellants.

Kazan, McClain, Satterley & Greenwood, David McClain, Ted W. Pelletier, Ian A. Rivamonte; Law Offices of Leon Friedman and Leon Friedman for Plaintiff and Respondent.

_____

**SUMMARY**

The principal issue in this case is whether a statement made by a "slightly unhinged" character in a motion picture, American Hustle (Columbia Pictures 2013), was made "in connection with a public issue or an issue of public interest" within the meaning of the anti-SLAPP (strategic lawsuit against public participation) statute. (Code Civ. Proc., § 425.16, subd. (e)(4).)[1] We hold that it was, and we also conclude plaintiff failed to show a probability of prevailing on his defamation and related claims. We reverse the trial court's order denying defendants' special motion to strike the complaint.

**FACTS**

We briefly summarize the facts, and then describe the evidence presented in the moving and opposition papers. We will elaborate on the facts as necessary in our discussion of the legal issues.

1. **The Parties and the Movie**

Plaintiff Paul Brodeur is a well-known author in the environmental field, pointing out health dangers of the use of various electrical devices and other household items. Among his many books is The Zapping of America: Microwaves, Their Deadly Risk, and the Coverup (1977) (hereafter The Zapping of America).

Defendants (Atlas Entertainment, Inc.; Annapurna Productions LLC, doing business as Annapurna Pictures; and Columbia Pictures Industries, Inc.) are producers and distributors of the motion picture American Hustle.

The film, set in 1978, is a "21st century screwball farce about 20th century con men," and uses the reality of a late 1970's FBI sting operation known as Abscam (which led to bribery convictions of a number of elected officials) as a "taking off point."

_____

[1] Further statutory references are to the Code of Civil Procedure.

(Turan, *Pros and cons – Crime caper shakes things up in style*, Los Angeles Times (Dec. 13, 2013) (Turan review).)  One film critic describes the film this way: " 'American Hustle' giddily embraces the excesses of its era, from spandex to 'staches, though it's a farce that speaks as well to this tarnished age.  Some of its extravagances are purely decorative . . . .  But all the shiny surfaces, the glitter ball and the gaudiness, also suggest a world in which everyone is anxious to shake off the post-Vietnam War, post-Watergate funk.  The ghost of Richard M. Nixon hovers in the air; everyone is a fake and everyone wears a mask, even Richie, the F.B.I. agent with the Chia Pet perm."  (Dargis, *Big Hair, Bad Scams, Motormouths*, The New York Times (Dec. 12, 2013) (Dargis review).)

In one scene in the film, one of the subjects of the sting operation (Carmine Polito, the mayor of a city in New Jersey) has given the principal character, con artist Irving Rosenfeld, a new microwave oven.  Irving asks what it is, and Carmine explains that it cooks food ("it's science, that's how it heats up the food, it's scientific") and tells him not to put metal in it.  In a later scene, Irving's "slightly unhinged" wife, Rosalyn,  causes the new microwave oven to explode by putting in it a container of food covered in tin foil, despite her husband's instructions "not to put metal in the science oven."  In the ensuing argument, Rosalyn says that she read, in a magazine article by plaintiff, that a microwave oven "takes all of the nutrition out of our food.  It's empty, just like your deals."  This is the dialogue:

> "[IRVING]:  I told you not to put metal in the science oven, what did you do that for?
>
> "[ROSALYN]:  Don't make such a big deal!  Just get another one.
>
> "[IRVING]:  I don't want another one, I want the one that Carmine [the New Jersey mayor whom Irving is conning] gave me.
>
> "[ROSALYN]:  Oh, Carmine!  I want the one that Carmine gave me!  Carmine! Carmine!  Why don't you just marry Carmine?  Get a little gold microwave and put it on a chain around your neck!  You wanna be more like Carmine?  Why don't you build something, like he does?  Instead of all your empty deals; they're

3

just like your fuckin' science oven.  You know, I read that it takes all of the nutrition out of our food!  It's empty, just like your deals.  Empty!  Empty!

"[IRVING]:  Listen to this bullshit.

"[ROSALYN]:  It's not bullshit!  I read it in an article, look:  By Paul Brodeur.  [Rosalyn hands Irving an article.]

"[ROSALYN]:   Bring something into this house that's gonna take all the nutrition out of our food and then light our house on fire?  Thank God for me."

Based on Rosalyn's statement (which, after adjusting his glasses and looking at the magazine Rosalyn has handed to him, Irving does not contradict), plaintiff sued defendants.  He alleged causes of action for libel, defamation, slander and false light, asserting that he had never made the quoted statement, and that by misquoting him, defendants "have suggested to the movie audience that Mr. Brodeur made a scientifically unsupportable statement," damaging his reputation.

2.     **The Special Motion to Strike the Complaint**

Defendants filed a special motion to strike the complaint, contending the complaint was based on speech "that is of 'public interest' or concerns a person in the 'public eye,' " and that plaintiff could not show a probability of prevailing on his claims.

Defendants contended all causes of action were based solely on production and distribution of a movie, American Hustle, "which is about a matter of 'public interest,' that is, the Abscam operation and the culture of the decade in which it took place." Defendants pointed out that "*any issue in which the public is interested*" is of " 'public interest' " (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042 (*Nygard*)), and the film's "uncontroverted critical success" was evidence of its public interest.

In support of their motion, defendants lodged a DVD of American Hustle, and presented evidence that the film "was a highly acclaimed motion picture which, among its many accolades, was nominated for 10 Academy Awards and won three Golden Globe awards, including Best Picture – Comedy or Musical."  A declaration from Donald R. Gordon, counsel for defendants, covered several topics.

First, Mr. Gordon's declaration stated that "[t]he safety of microwave ovens has been a matter of public controversy since at least the early 1970's, in large part because of the writings of the plaintiff, Paul Brodeur." The declaration tells us that plaintiff authored a series of articles in The New Yorker (later revised and published as a book, The Zapping of America), highlighting his conviction "that microwaves, including those emitted by microwave ovens, represent a serious threat to the health of the American people." Mr. Gordon's declaration quotes from and attaches excerpts from The Zapping of America, including plaintiff's questioning of the overall safety of microwave ovens and references to claims that microwaves may cause eye cataracts.

The declaration also describes plaintiff's 1978 interview published in People Magazine, in which he predicted "an 'avalanche of litigation' arising from the widespread use of microwaves in American society." In that interview, plaintiff was asked if there is "any danger in eating food cooked by microwaves," and he responded, "None that is known."

Second, Mr. Gordon's declaration describes the film, and the character who utters the allegedly defamatory statement. "Rosalyn is established early in the film as an emotionally unstable character prone to outrageous behavior." When she first appears in the film, she and Irving are talking about the fire she started with her new sunlamp. ("Just stop with the whole fire thing. God, it was a mistake. I'm sure a million people do that. All the time. Those sunlamps are dangerous. Shouldn't even have them in the house really.") "Throughout the movie, Rosalyn is portrayed as an untrustworthy person and a font of misinformation," who "will share her off-kilter observations with anyone."

Third, Mr. Gordon describes "the farcical scene complained of by Plaintiff" in which Rosalyn "attempts to use a series of red herrings to distract her husband Irving from criticizing her regarding her destruction of the microwave oven . . . ."

Finally, Mr. Gordon's declaration stated that "[c]laims that the government safety standard for microwave ovens is inadequate, such as those made in [plaintiff's] articles and books, have been rejected by numerous authorities, as evidenced by reports in the

5

*New York Times* [(July 10, 2007)], and websites for the Food and Drug Administration and the American Cancer Society."

### 3.     Plaintiff's Opposition

Plaintiff's opposition contended that the anti-SLAPP statute does not apply, because "the specific conduct that forms the basis of the lawsuit is [plaintiff's] alleged comments about microwave radiation," while "the public-interest topic addressed in *American Hustle* is the Abscam scandal," and defendants "fail to draw any connection between the Abscam scandal and [plaintiff's] defamation and false-light claims . . . ." Plaintiff relied heavily on *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280 (*Dyer*) (while movies involve free speech, "not all speech in a movie is of public significance and therefore entitled to protection under the anti-SLAPP statute.  The issue turns on the specific nature of the speech rather than generalities abstracted from it.").

As evidence supporting his opposition to defendant's motion, plaintiff filed two declarations from his counsel, Leon Friedman and Ian A. Rivamonte.

Mr. Friedman's declaration presented evidence "to complete [plaintiff's] qualifications," showing "the high esteem that [plaintiff] holds in the field of environmental dangers to the human community, a reputation that is undermined by misquoting him about an accepted and acknowledged environmental issue." Mr. Friedman's evidence included pages from plaintiff's website showing the many honors plaintiff has received "in his campaign against environmental dangers created by humans"; his four books on asbestos-related health hazards and various awards plaintiff received for the articles on which the books were based; his articles on the dangers from depletion of the ozone level and related awards; articles about hazardous substances in household detergents, cancer-producing chemicals in drinking water, and carcinogenic and reproductive hazards of anesthetic gases to anesthesiologists and nurse anesthetists.

Mr. Friedman also stated that plaintiff's "pioneering articles on the health hazards associated with exposure to microwave radiation" won an award and were the basis for a book (The Zapping of America) recognized by The New York Times as one of the notable books of 1977.  Plaintiff's articles on the hazards of exposure to electromagnetic

6

fields won a public service award and became the basis for two later books:  Currents of Death (1989) and The Great Power-Line Cover Up (1993).

A declaration from Ian A. Rivamonte presented copies of plaintiff's complaint; reviews of American Hustle by two film critics (the Dargis review and the Turan review) and an article about plaintiff in People Magazine (*The Microwave Menace Is Zapping Us All, Warns Writer Paul Brodeur* (interview with Paul Brodeur) (Jan. 30, 1978)).

**4.      Defendants' Reply**

In reply, defendants contended the *Dyer* case was inapplicable because the plaintiff there was not a public figure, and later case law defines public interest issues "in extremely broad terms."  Defendants also pointed out that plaintiff ignored "that the Movie's subjects included not only the ABSCAM scandal itself, but the broader late-1970s culture that produced it . . . .  Even the narrower issue about the public's unease concerning microwaves was highlighted in the sole scene that is the focus of [plaintiff's] Complaint.  All three topics are indisputably matters of public interest and/or public issues as those terms have been broadly defined."

**5.      The Trial Court's Ruling**

The trial court denied defendants' motion.  Defendants filed a timely notice of appeal.

After the parties briefed the case, we granted a request from 11 businesses, associations and advocacy organizations to file an amici curiae brief in support of defendants.  Amici curiae also filed a motion requesting judicial notice of 34 exhibits.  These include (1) the legislative history for bills that enacted the 1997 amendment to section 425.16 (exh. GG), supporting a broad interpretation of section 425.16; (2) articles from the federal government regarding Abscam (exh. FF) and the safety of the microwave oven (exhs. B & I), to illustrate the public interest in these two subjects; and various other articles, biographies, lists and news releases that are said to demonstrate "the significant public interest in the subjects at issue in this case:  including the film itself, the culture of the 1970s, the Abscam scandal, the safety of microwave ovens, and

7

[plaintiff]." Plaintiff has not opposed the request for judicial notice, and we grant the request.

## DISCUSSION

We review the applicable legal principles and then turn to their application in this case.

### 1. The Legal Principles

A defendant may bring a special motion to strike any cause of action "arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16, subd. (b)(1).) As relevant here, an " 'act in furtherance of a person's right of petition or free speech . . . in connection with a public issue' " includes "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" (*id.*, subd. (e)(3)), or "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest" (*id.*, subd. (e)(4)).

When ruling on an anti-SLAPP motion, the trial court employs a two-step process. It first looks to see whether the moving party has made a threshold showing that the challenged causes of action arise from protected activity. (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).) If the moving party meets this threshold requirement, the burden then shifts to the other party to demonstrate a probability of prevailing on its claims. (*Ibid.*) In making these determinations, the trial court considers "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." (§ 425.16, subd. (b)(2); *HMS Capital, Inc. v. Lawyers Title Co.* (2004) 118 Cal.App.4th 204, 212 ["In opposing an anti-SLAPP motion, the plaintiff cannot rely on the allegations of the complaint, but must produce evidence that would be admissible at trial."].)

Our review is de novo. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)

8

**2. This Case**

As we observed at the outset, we conclude defendants made the necessary threshold showing that plaintiff's complaint arose from protected activity, and plaintiff failed to produce evidence legally sufficient, if credited, to support a judgment in his favor.

**a. The first prong: protected activity**

The dispute in this case is over whether the "public interest" element of the anti-SLAPP statute has been satisfied. (§ 425.16, subd. (e)(3) & (4).) We note a few preliminary points.

First, "it is beyond dispute that movies involve free speech." (*Dyer, supra,* 147 Cal.App.4th at p. 1280.)

Second, it is likewise beyond dispute that the anti-SLAPP statute, including the scope of the term "public interest," is to be construed broadly. (*Nygard, supra,* 159 Cal.App.4th at pp. 1039-1042 [discussing cases and legislative history of 1997 amendment adding the directive to construe the statute broadly].) *Nygard* concludes: "Taken together, these cases and the legislative history that discusses them suggest that 'an issue of public interest' within the meaning of section 425.16, subdivision (e)(3) is *any issue in which the public is interested.* In other words, the issue need not be 'significant' to be protected by the anti-SLAPP statute—it is enough that it is one in which the public takes an interest." (*Id.* at p. 1042.)

Third, case precedent confirms there is a public interest "in the writing, casting and broadcasting" of an episode of a popular television program. (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 144 (*Tamkin*).) Rejecting a claim that the defendants were not entitled to anti-SLAPP protection because the defendant screenwriter could have used fictional names, instead of the plaintiffs' real names, in casting synopses that were leaked and posted on various web sites, *Tamkin* said: "As stated in a different context, '[t]he creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried, and, in the end, either discarded or used. . . . [¶] . . . We must not

9

permit juries to dissect the creative process in order to determine what was *necessary* to achieve the final product and what was not, and to impose liability . . . for that portion deemed unnecessary. Creativity is, by its nature, creative. It is unpredictable. Much that is not obvious can be necessary to the creative process.' " (*Id.* at pp. 144-145, quoting *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 298 (conc. opn. of Chin, J.) [addressing workplace sexual harassment claim].)

With these principles in mind, we think it clear that plaintiff's causes of action arise from defendants' protected activity within the meaning of the anti-SLAPP statute. Plaintiff, by his own account, is a public figure, a prolific, "well-known author in the environmental field." The views expressed in his "pioneering articles on the health hazards associated with exposure to microwave radiation" were plainly a matter of public interest in the 1970's, and his claims that the government safety standard for microwave ovens was inadequate "have been rejected by numerous authorities . . . ."

At the same time, American Hustle is a "screwball farce" (Turan review, *supra*), set in the 1970's, that "giddily embraces the excesses of its era" (Dargis review, *supra*). Plaintiff admits that "Abscam is, without dispute, a matter of public interest," and we think it equally undisputable that "the culture of the decade in which it took place" is likewise a matter of public interest. (As one reviewer put it, "So back we go to 1978, to the era of gold chains, aviator sunglasses, outlandish clothes and hair that just wouldn't quit." (Dargis review, *supra.*)) (See *Dyer*, *supra,* 147 Cal.App.4th at p. 1284 [assuming "the issues facing Generation X at the start of the 1990's are of significant interest to the public"].) In these circumstances, we can see no basis for concluding that a farcical scene about microwave ovens – clearly emanating from matters in which the public was interested during the relevant decade – is anything other than protected activity within the meaning of the anti-SLAPP statute.

Plaintiff insists that Rosalyn's statement in the microwave oven scene is in "no way related to any public purpose that may exist in the film's other scenes," and relies on the *Dyer* case. We find plaintiff's position untenable, and *Dyer* inapt in this case.

10

*Dyer* involved a film addressing "the issues facing Generation X in the 1990's," in which Ethan Hawke portrays a rebellious slacker named Troy Dyer, who was a classmate of the defendant screenwriter. Mr. Dyer sued for defamation and false light invasion of privacy "based on the allegedly unflattering representation of Troy Dyer in the movie." (*Dyer, supra,* 147 Cal.App.4th at pp. 1276-1277.) *Dyer* affirmed the denial of the defendants' SLAPP motion, concluding that "the assertedly false portrayal of Dyer's persona in the movie" was not protected activity. (*Id.* at p. 1276.) The court said that "not all speech in a movie is of public significance" and the "issue turns on the specific nature of the speech rather than generalities abstracted from it." (*Id.* at p. 1280.)

In *Dyer*, the court found "the specific dispute" concerned the alleged misuse of Mr. Dyer's persona, in which there was "no discernable public interest." (*Dyer, supra,* 147 Cal.App.4th at p. 1280.) "Although [the film] may address topics of widespread public interest, defendants are unable to draw any connection between those topics and Dyer's defamation and false light claims." (*Ibid*.) *Dyer* distinguished other cases, where the plaintiffs "voluntarily thrust themselves into a discussion of public topics," while Mr. Dyer "did not interject himself into any public debate" and was not "a public figure in any defined subculture" (*id.* at p. 1281) and "was not connected to any [public] discussion" (*id.* at p. 1283).

This case is nothing like *Dyer*. Here, plaintiff is, by his own evidence, a public figure – not a private figure like Mr. Dyer, who did nothing to insert himself into the discussion of any public topic or debate. (Cf. *Jewett v. Capital One Bank* (2003) 113 Cal.App.4th 805, 814 ["[a] public issue is implicated if the subject of the statement or activity underlying the claim . . . was a person or entity in the public eye"].) That distinction alone renders *Dyer* inapplicable here. In addition, as *Tamkin* points out, *Dyer* is distinguishable because the *Dyer* court "did not address whether there was any public interest in the creative process underlying the production of the film." (*Tamkin, supra,* 193 Cal.App.4th at p. 144.)

*Tamkin* involved claims for defamation and false light invasion of privacy that arose from the defendants' conduct during the production of an episode of the popular

11

television series *CSI: Crime Scene Investigation*, and we find it instructive here. One of the defendant screenwriters had been involved in a real estate transaction with the plaintiffs, who were real estate agents married to each other. The screenwriter used their names in a draft script for the *CSI* episode and, although their surname was changed in the broadcast of the episode, casting synopses with their names were leaked to internet web sites before the broadcast. *Tamkin* held that the writer's use of the plaintiffs' names was an act in furtherance of free speech rights because it "helped to advance or assist in the creation, casting, and broadcasting of an episode of a popular television show." (*Tamkin, supra,* 193 Cal.App.4th at p. 143.) And the defendants' acts were in connection with a matter of public interest: "Here, the creation and broadcasting of *CSI* episode 913 is an issue of public interest because the public was demonstrably interested in the creation and broadcasting of that episode, as shown by the posting of the casting synopses on various Web sites and the ratings for the episode." (*Ibid.*)

The *Tamkin* court rejected the plaintiffs' reliance on *Dyer*, as noted above, stating that the *Tamkin* defendants showed there was a public interest in the writing, casting and broadcasting of the *CSI* episode, and "a connection between the use of plaintiffs' names and the creative process underlying" the episode. (*Tamkin, supra,* 193 Cal.App.4th at p. 144.) *Tamkin* also dismissed the *Dyer* court's focus on the lack of a discernable public interest in Mr. Dyer's persona, finding "no requirement in the anti-SLAPP statute that the plaintiff's persona be a matter of public interest." (*Tamkin*, at p. 144.)

In this case, plaintiff contends we must focus "on the words or conduct that formed the basis for [plaintiff's] lawsuit, rather than on the First Amendment basis of the entire work in which the words or conduct appeared." We do not disagree that the focus is on defendants' words or conduct: here, a farcical scene drawing on a controversy over the safety of microwave ovens. We do disagree, however, with the implication that the allegedly defamatory statement made in the scene "has no bearing" on the film's depiction of American culture during the 1970's, and that there is no "connection" between the topics of the film and that scene.

12

In short, we decline " 'to dissect the creative process' " (*Tamkin, supra,* 193 Cal.App.4th at p. 144), as plaintiff would effectively have us do, and we reject the notion that the character Rosalyn's statement in the microwave oven scene is in "no way related" to the public interest "in the film's other scenes." The relatedness, in our view, is clear: the microwave oven scene plainly drew on an issue of public interest in the 1970's, and plaintiff was an integral part of that issue at the time. Whether we consider the public interest in the movie as a whole – which is conceded and undeniable – or the public interest in the particular topic being discussed in the scene at issue – which likewise existed during the era being depicted – our conclusion remains the same. Defendants' conduct in writing and broadcasting the microwave oven scene was protected activity within the meaning of the anti-SLAPP statute.

**b.      The second prong:  probability of prevailing on the merits**

In the second step of a SLAPP analysis, we determine whether plaintiff has produced evidence demonstrating a probability of prevailing on his claims. We conclude he has not.

**i.      The legal requirements**

"Defamation is 'a false and unprivileged publication that exposes the plaintiff "to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation." [Citation.]' [Citations.]" (*Nygard, supra,* 159 Cal.App.4th at pp. 1047-1048; see also *Taus v. Loftus* (2007) 40 Cal.4th 683, 720 ["The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' "].) " 'The *sine qua non* of recovery for defamation . . . is the existence of a falsehood.' [Citaton.]" (*Baker v. Los Angeles Herald Examiner* (1986) 42 Cal.3d 254, 259 (*Baker*).) "Further, when the plaintiff is a public figure, he or she 'must also show the speaker made the objectionable statements with malice in its constitutional sense " 'that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' " [Citation.]' [Citation.]" (*Nygard, supra,* at p. 1048.)

13

"A 'false light' claim, like libel, exposes a person to hatred, contempt, ridicule, or obloquy and assumes the audience will recognize it as such." (*M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 636.) "A 'false light' cause of action is in substance equivalent to a libel claim, and should meet the same requirements of the libel claim, including proof of malice." (*Aisenson v. American Broadcasting Co.* (1990) 220 Cal.App.3d 146, 161.)

To show a probability of prevailing on his claims, " 'the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." [Citations.] . . . [T]hough the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim. [Citation.]' [Citation.]" (*Taus v. Loftus, supra,* 40 Cal.4th at pp. 713-714.)

"The plaintiff may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence." (*Paiva v. Nichols* (2008) 168 Cal.App.4th 1007, 1017.)

### ii. Application in this case

Here, plaintiff has failed to produce admissible evidence that, as his unverified complaint alleges, he "has never written an article or ever declared in any way that a microwave oven 'takes all of the nutrition out of food.' "

First, while it would have been a simple matter to do so, plaintiff submitted no declaration so stating. (See *Nygard, supra,* 159 Cal.App.4th at p. 1054 ["if [the defendant's] version of events was inaccurate, plaintiffs could have submitted prima facie evidence of its falsity through the declaration of [plaintiff's chairman and founder]. Because plaintiffs did not do so, we conclude that plaintiffs failed to carry their burden of making a prima facie showing of falsity."].)

Second, the evidence plaintiff relies on to establish the falsity of Rosalyn's statement does not do so. Plaintiff cites only his 1978 interview in People Magazine,

14

where he was asked: "Is there any danger in eating food cooked by microwaves?" and he responded, "None that is known." While this was clearly a statement that there are no known dangers in eating microwaved food (as opposed to dangers to the human body of microwaves themselves), it is not a statement, one way or the other, about whether microwave ovens reduce the nutritional value of food. This leaves the record devoid of any evidence of whether or not plaintiff ever made the statement Rosalyn attributes to him.

Plaintiff asserts he submitted evidence that Rosalyn's statement "is provably false," relying on a statement from the Food and Drug Administration (FDA) that "[m]icrowave cooking does not reduce the nutritional value of foods any more than conventional cooking," and "[i]n fact, foods cooked in a microwave oven may keep more of their vitamins and minerals, because microwave ovens can cook more quickly and without adding water." (This document was attached to Mr. Gordon's declaration supporting defendants' SLAPP motion.) Of course the FDA document does show that, in 2015, we knew that, contrary to Rosalyn's comment, microwave ovens do not "take all the nutrition out of our food." But the document says nothing about the state of understanding on that point in the 1970's, and plaintiff produced no evidence that the statement was known to be "scientifically unsupportable" in the 1970's. And plainly the FDA document proves nothing about whether or not plaintiff actually made such a statement in the 1970's.

Third, we agree with defendants that Rosalyn's comment in the microwave oven scene in any event is not reasonably susceptible of a defamatory meaning. American Hustle is, after all, a farce. The stage was set at the beginning of the film. (" 'Some of this actually happened,' is the line that appears on screen to start things off, and it sets the tone perfectly." (Turan review, *supra*.)) The character who utters the allegedly defamatory statement is portrayed throughout the movie as "slightly unhinged" and "a font of misinformation," and Irving and Rosalyn both refer to the microwave oven as the "science oven." We doubt any audience member would perceive any of Rosalyn's dialogue as assertions of objective fact. (Cf. *Baker, supra,* 42 Cal.3d at p. 267 [a

15

television reviewer printed a hypothetical conversation between a station vice president (the plaintiff) and his writer/producer; the court found no reasonable reader would conclude the plaintiff in fact had made the statement attributed to him]; see also *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 512-513 ["In other instances, an acknowledgment that the work is so-called docudrama or historical fiction . . . might indicate that the quotations should not be interpreted as the actual statements of the speaker to whom they are attributed."]; *Partington v. Bugliosi* (9th Cir. 1995) 56 F.3d 1147, 1154-1155 ["the general tenor of the docudrama also tends to negate the impression that the statements involved represented a false assertion of objective fact"; docudramas "often rely heavily upon dramatic interpretations of events and dialogue filled with rhetorical flourishes"; "viewers in this case would be sufficiently familiar with this genre to avoid assuming that all statements within them represent assertions of verifiable facts. To the contrary, most of them are aware by now that parts of such programs are more fiction than fact."].)

Authorities addressing whether an allegedly defamatory statement is an actionable statement of fact or a constitutionally protected statement of opinion, while not directly applicable, are instructive here. If an expression of opinion "implies a false assertion of fact, the opinion can constitute actionable defamation." (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696.) The question whether challenged statements " 'convey the requisite factual imputation' " is ordinarily a question of law for the court. (*Ibid.*) In making those determinations, courts "apply a totality of the circumstances test pursuant to which we consider both the language of the statement itself and the context in which it is made." (*Ibid.*; see also *Knievel v. ESPN* (9th Cir. 2005) 393 F.3d 1068, 1075 ["First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false."].)

Here, as we have pointed out, the general tenor of American Hustle, the entirely farcical nature of the "science oven" scene, and the ditzy nature of the character uttering the allegedly defamatory statement, all indicate that an audience would not expect anything Rosalyn says to reflect objective fact.  Plaintiff failed to carry his burden of showing a probability of prevailing on his defamation claim, and the "collapse of [the] defamation claim spells the demise of all other causes of action . . . allegedly aris[ing] from the same publications . . . ."  (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 34.) Defendants' anti-SLAPP motion should have been granted.

## DISPOSITION

The order denying the motion to strike is reversed.  The trial court is directed to enter a new and different order granting the motion and awarding defendants their attorney fees and costs.  (Code Civ. Proc., § 425.16, subd. (c).)  Defendants shall recover their costs on appeal.


GRIMES, J.

WE CONCUR:


RUBIN, Acting P. J.


FLIER, J.

17

Filed 6/27/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| PAUL BRODEUR, | B263379 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC562288) |
| v. | |
| ATLAS ENTERTAINMENT, INC., et al., | **ORDER CERTIFYING OPINION FOR PUBLICATION** |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion in the above-entitled matter filed on June 6, 2016, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

There is no change in the judgment.

_____

RUBIN, Acting P. J.                    FLIER, J.                    GRIMES, J.