Filed 3/20/26  Hara v. Netflix CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| LANCE HARA, Plaintiff and Respondent, v. NETFLIX, INC. et al., Defendants and Appellants. | B340401 (Los Angeles County Super. Ct. No. 23STCV27581) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jon R. Takasugi, Judge.  Reversed.

Davis Wright Tremaine, Diana Palacios, Cristina Salvato, and Joel Richert for Defendants and Appellants.

Valkyrie Law Group and Heather L. Blaise for Plaintiff and Respondent.

In this anti-SLAPP appeal, defendants and appellants[1] are the creators and producers of an animated television series titled *Q-Force*, which is about a group of Lesbian, Gay, Bisexual, Transgender, or Queer (LGBTQ) spies. Plaintiff and respondent Lance Hara, a performer using the name Vicky Vox (plaintiff or Vox), filed a complaint alleging she is a "well-known" drag queen in Hollywood and complaining defendants wrongfully used her likeness in *Q-Force* without her consent. Defendants and appellants filed an anti-SLAPP motion arguing the complaint arose from conduct protected by the anti-SLAPP statute and had no merit. The trial court agreed the complaint targeted protected activity under the anti-SLAPP statute, but it denied the anti-SLAPP motion because it found Vox's claims were supported by a sufficient prima facie showing. Defendants now ask us to decide whether this was error because Vox's claims are barred by the First Amendment and therefore have no prospect of succeeding.

## I. BACKGROUND

### A. *Q-Force and Vox, as Alleged in Vox's Complaint*

In 2021, Netflix released *Q-Force*, a 10-episode animated series that features a group of LGBTQ-spies who, "despite being the best in their field, are undervalued due to their sexualities and identities." Gabe Liedman (Liedman), a co-creator,

---

[1] The defendants and appellants are Netflix, Inc. (Netflix), Titmouse Inc., LOL Send, Inc., Gabe Liedman, Fremulon, LLC, Michael Schur, Universal Television LLC, Hazy Mills Productions, Inc., Sean Hayes, Todd Milliner, Ben Heins, 3 Arts Entertainment, LLC, David Miner, and Max Silvestri (collectively, defendants).

showrunner, writer, and executive producer of *Q-Force*, publicly stated every character in *Q-Force* was based on someone in real life in order to ground the series in reality.

Vox is a "well-known Drag Queen in Hollywood who hosts VIP events [at venues like] the Roosevelt Hotel in Hollywood and Hamburger Mary's in West Hollywood." Vox is best known for her drag band. She has appeared in theater productions, reality TV shows, music videos, and at least one film. Vox commonly uses a handheld folding fan as part of her drag persona, and she has fans with her name and likeness on them. Vox has a web series, *The Vicky Vox Project*, that depicts a cartoon-like illustration of Vox.

### B.    The Alleged Uses of Vox's Likeness

Defendants allegedly used Vox's likeness in one scene of one of the ten 30-minute episodes of *Q-Force*.[2] Specifically, the scene takes place during episode 5 of the series, which is titled "WeHo Confidential." It begins with four other characters, including one named Steve, chatting at a table in what appears to be a bar in West Hollywood. During the conversation, Steve says it is time for him to plug back into his community. Shortly thereafter, he calls out to another character, Twink, who is

---

[2]    As Vox's complaint describes it, the background character at issue allegedly shares the following similarities with a photograph taken of Vox inside a bar in West Hollywood: "voluminous red-orange hair styled with a center part, defined, close together eyebrows, cat-eye make-up, face shape, nose structure, full jawline, high cheek bones, full bodied figured, her outfit's color is the same shade and tone of teal, and she is depicted inside a bar in West Hollywood."

sitting at a different table. As the perspective shifts to show Twink, the side profile of the background character allegedly resembling Vox is visible for approximately one second. The entirety of the character's seated form is then visible for approximately the next ten seconds, along with the seated forms of Twink and three other drag queens.

Twink replies to Steve and whispers to the others at the table, "That's my job daddy." The drag queens turn to look at Steve. Three of them pull out eyewear (pink sunglasses, opera glasses, and a monocle), and the character allegedly based upon Vox flicks open an orange folding fan with the word "Hot" written on it, and fans herself. Twink tells Steve they are having a union meeting. Steve expresses surprise that drag queens have a union, and Twink responds by saying Steve has lived in WeHo so long and yet knows so little, before briefly describing the union. During Twink's reply, the left edge of the character allegedly resembling Vox, including her shoulder, hair, and the edge of her fan, are visible for approximately nine additional seconds. The assertedly Vox-like background character does not reappear at any other point in the episode.

In addition to the episode, Netflix used approximately four to five seconds of this same scene, including the moment in which the character allegedly resembling Vox opens her fan, at the beginning of the 40-second "official teaser" trailer for *Q-Force* posted on YouTube during Pride Month in 2021.[3] (Netflix, Q-FORCE Official Teaser Netflix, YouTube (Jun. 23, 2021),

---

[3]      Another character that has no resemblance to Vox also displays a handheld fan (bearing the word "slay") in the Q-Force teaser trailer.

4

<https://www.youtube.com/watch?v=Fk9s-zTbq28> (last visited November 24, 2025).) The cartoon character said to resemble Vox appears in approximately 12% of the teaser trailer.

Defendants also disseminated a still image from the scene featuring the character allegedly resembling Vox to advertise Netflix's subscription-based streaming services, the series, and the episode. Netflix provided the still to at least one online publication in relation to an article promoting *Q-Force*. Defendants also promoted the series to entertainment trade publications like *Variety*.

Following the release of advertisements depicting the background character who resembles Vox, Vox was contacted by family, friends, fellow drag performers, and fans regarding the depiction of her image and likeness in the advertisements. Many of the people who contacted Vox expressed confusion and concern about her connection with *Q-Force*. The teaser trailer resulted in negative criticism about the perpetuation of harmful stereotypes of the LGBTQ community.

### C. Vox's Causes of Action

Vox filed her complaint in this action in November 2023,[4] and it alleges she did not grant her permission to have her image

---

[4] Before that, in May 2023, Vox brought misappropriation and right of publicity claims, alongside a Lanham Act claim, in federal court. (*Lance Hara p/k/a Vicky Vox v. Netflix, Inc., et al.* (C.D.Cal.) Case No. 2:23-cv-03456-RGK-AS). Defendants filed a motion to dismiss and an anti-SLAPP motion. The federal court dismissed the Lanham Act claim with prejudice without reaching the state law claims, (*Hara v. Netflix, Inc.* (C.D.Cal. Oct. 26, 2023, No. 2:23-cv-03456-RGK-AS) 2023 U.S.Dist. Lexis 248082),

or likeness used as a stereotypical drag performer for the purpose of appealing to potential viewers or to show or imply her affiliation with or endorsement of *Q-Force* or defendants. Vox further alleges Netflix has exhibited a pattern of problematic behavior toward the LGBTQ community and Vox would never have granted Netflix the right to commercially exploit her image and likeness.

The complaint asserts three causes of action: violation of California's statutory right of publicity (Civ. Code, § 3344); violation of California's common law right of publicity; and invasion of privacy by appropriation. The Civil Code-based cause of action alleges defendants infringed on Vox's publicity rights and used her image or likeness without her consent, caused confusion in the marketplace because Vox's fans believed the use was authorized, damaged the value of her merchandise in the marketplace, and harmed her goodwill and reputation. Vox alleges that given her "established brand and image, professional reputation, and moral commitment as a champion of the working class, she never would have licensed her image or likeness in connection with the show *Q-Force*," and is "appalled, disgusted, and embarrassed to see her image and/or likeness falsely endorsing Defendants' products because such unauthorized use creates a perception of hypocrisy in the public eye and irreparably undermines the important international social work that has been [Vox's] adult life's mission . . . ." The cause of action for violation of the common law right of publicity is substantially similar—alleging defendants infringed on Vox's

_____

and the Ninth Circuit Court of Appeals affirmed (*Hara v. Netflix, Inc.* (9th Cir. 2025) 146 F.4th 872).

6

publicity rights for the purpose of advertising and marketing *Q-Force*. The invasion of privacy by appropriation cause of action alleges defendants' "use of Plaintiff's likeness depicts her as an unspeaking background character whose sole role is to perform a fan 'thworp' as a punchline to another character's joke, thus reducing her identity, her long and accomplished career, and her regular presence at Hamburger Mary's West Hollywood to a mere element of the setting, a part of the furniture." The invasion of privacy claim also alleges *Q-Force* has been widely panned and criticized by members of the LGBTQ community for upholding and reinforcing harmful stereotypes about the community and Vox's unconsented-to association with *Q-Force* has caused her mental distress and dignitary harm.

Vox prays for compensatory damages for the unauthorized use of her likeness, an accounting for and payment of actual damages, all gains, profit, and advantages derived as a result of the unauthorized use, punitive damages, an injunction preventing the unauthorized use of Vox's image or likeness, attorney fees and costs, and pre- and post-judgment interest.

### D. The Anti-SLAPP Proceedings
#### 1. Defendants' motion
Defendants filed a special motion to strike Vox's complaint pursuant to Code of Civil Procedure section 425.16.[5] Defendants contended *Q-Force* is protected speech made in a public forum in connection with an issue of public interest. Defendants argued *Q-Force* constitutes speech in connection with matters of public

---

[5] Undesignated statutory references that follow are to the Code of Civil Procedure.

interest because the creation of popular entertainment is itself a matter of public interest; they also asserted the extensive media coverage surrounding *Q-Force* was further evidence of its status as a matter of public interest. Defendants additionally argued Vox could not show a probability of prevailing on the merits of her claims. They argued that because *Q-Force* is an expressive work, Vox's right of publicity claims are barred by the First Amendment. They also argued the alleged depiction of Vox in *Q-Force* is "transformative" under the test articulated by the California Supreme Court and thus entitled to First Amendment protection. Defendants further contended Vox's claims failed because the underlying conduct was noncommercial speech and she had not alleged actual malice. And they argued Vox's claims were independently barred by the doctrine of incidental use.

In support of their motion, defendants submitted Episode 5 of *Q-Force*, a screenshot of the YouTube page depicting the official teaser trailer for *Q-Force*, a screenshot of Netflix's own webpage associated with *Q-Force*, and two minute orders in the federal action we identified earlier in the margin. Defendants also submitted five reviews or articles about the show from publications including NPR, The Hollywood Reporter, Variety, and The Guardian. One highlights that the series "is the product of many queer creators, both behind the scenes—as writers, producers[,] and animators—and behind the mic," and questions whether it makes a "palpable difference that, in most cases, queer characters are voiced by queer actors[ ] and straight characters by straight actors." (Weldon, *'Q-Force' Trafficks In Queer Stereotypes — Then Drives Through Them*, NPR (Sept. 2, 2021) <https://www.npr.org/2021/09/02/1032850162/q-force-trafficks-in-queer-stereotypes-then-drives-through-them> [as of

8

Dec. 3, 2025].)  Another discussed where *Q-Force* falls in the spectrum of "[r]epresentational progress."  (Fienberg, *Sean Hayes and Wanda Sykes in Netflix's 'Q-Force': TV Review*, The Hollywood Reporter (Sept. 1, 2021) <https://www.hollywoodreporter.com/tv/tv-reviews/q-force-1235006128/> [as of Dec. 3, 2025].)  Yet another described *Q-Force* as a show that "attempts . . . to . . . comment on the power of queer communities" and "attempt[s] to renovate its genre." (D'Addario, *Gay Espionage Series 'Q-Force' Lacks a Central Presence to Pull It Together: TV Review*, Variety (Aug. 26, 2021) <https://variety.com/2021/tv/reviews/q-force-netflix-review-1235049159/> [as of Dec. 3, 2025].)

### 2. *Vox's opposition*

Vox opposed the anti-SLAPP motion, contesting defendants' arguments on both anti-SLAPP prongs (protected activity and minimal merit).  (See generally *Baral v. Schnitt* (2016) 1 Cal.5th 376, 384-385 [a moving defendant must make a prima facie showing of protected activity and, if that showing is made, the plaintiff must demonstrate the challenged claims have at least "'minimal merit'"].)  On the question of anti-SLAPP protected activity, Vox argued the use of her image and drag persona did not implicate or contribute to the public discussion of any public issue.  On the question of whether Vox had a probability of prevailing on her claims, Vox argued Liebman admitted he wanted to hire actual drag queens but received pushback—which in her view established the decision to use her likeness was a commercial decision, not an expressive one.  Vox also argued defendants' alleged use of her likeness was not transformative because defendants "simply recreated [her]

9

likeness as a cartoon and plugged her into the very setting in which [she] worked to achieve her renown . . . ."

### 3. *The trial court's order*

After holding a hearing, the trial court issued an order denying defendants' anti-SLAPP motion. The court agreed with defendants that the first prong of the anti-SLAPP analysis was satisfied because Vox was—by her own allegation—a public figure in a defined subculture and her claimed inclusion in the series was connected to a matter of public interest. Turning to whether Vox had established a probability of prevailing on the merits, the court found her evidence supported a reasonable inference that defendants' use of Vox's likeness was fundamentally not expressive, and thus not transformative. The court emphasized that Vox was not a character in *Q-Force* and her alleged inclusion was not part of any storyline or expressive feature of the series itself; indeed, in the court's view, Vox was depicted without any commentary or actual expressive purpose. The court accordingly found Vox's allegations could show defendants' aim in using Vox's likeness in the series was to appropriate her image and character, without compensation, for commercial promotion of an audiovisual work and for unrelated goods and services. The court concluded there was a factual dispute regarding the commercial classification of *Q-Force*, its advertisements, the advertisements for other goods and services that are unrelated to the *Q-Force* series, and defendants' intent in including Vox without her authorization. Because the court concluded the speech could be classified as commercial, it found Vox was not required to demonstrate actual malice. And because Vox was, in the court's view, prominently included in

10

advertisements for the series, there was a factual issue as to whether defendants' use was incidental.

## II. DISCUSSION

We agree with the trial court's conclusion that the challenged conduct, all of which relates to the creation and promotion of a television show that generated significant discussion and public debate, falls comfortably within the scope of the anti-SLAPP statute's definition of protected activity. We disagree, however, with the trial court's conclusion that Vox demonstrated minimal merit. *Q-Force* is an expressive work. Vox's alleged likeness was not the sum and substance of *Q-Force*, but merely one of many raw materials defendants used in telling a part of the larger *Q-Force* story. As such, defendants' actions merit First Amendment protection that bars any possibility that Vox could prevail on the merits of any of her claims.

### A. *The Complaint's Causes of Action Arise from Protected Activity*

There are four categories of protected activity defined in the anti-SLAPP statute. Defendants invoke two: statements in a public forum in connection with an issue of public interest and conduct in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e)(3), (4); see also *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 145-146 ["In articulating what constitutes a matter of public interest, courts look to certain specific considerations, such as whether the subject of the speech or activity 'was a person or entity in the public eye' or 'could affect large numbers of people beyond the

11

direct participants' [citation]; and whether the activity 'occur[red] in the context of an ongoing controversy, dispute[,] or discussion' [citation], or 'affect[ed] a community in a manner similar to that of a governmental entity' [citation]".)  "A claim arises from protected activity when that activity underlies or forms the basis for the claim."  (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062.)  Whether a claim is based on protected activity turns on "whether the "'core injury-producing conduct'" warranting relief under that cause of action is protected activity."  (*Mission Beverage Co. v. Pabst Brewing Co., LLC* (2017) 15 Cal.App.5th 686, 698.)

The alleged wrongs underlying Vox's complaint include using Vox's likeness as a non-speaking background character in the *Q-Force* animated television show, using that character in a single scene featuring five drag queens having a union meeting at a West Hollywood bar, utilizing a portion of that scene in a teaser trailer for *Q-Force*, and utilizing a still image from that scene in other marketing for the series.  In other words, all the pertinent acts were part of the creation of the television series, the series itself, and advertisements promoting it.

The creation of a television show is an exercise of free speech.  (*Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143-144.)  "Steps taken to advance such constitutionally protected expression are properly considered 'conduct in furtherance of' the exercise of the right of free speech within the meaning of section 425.16, subdivision (e)(4). [Citations.]"  (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 816-817.)  "'[T]he creative process must be unfettered, especially because it can often take strange turns, as many bizarre and potentially offensive ideas are suggested, tried,

and, in the end, either discarded or used . . . .  [¶] . . . We must not permit juries to dissect the creative process in order to determine what was necessary to achieve the final product . . . .'" (*Tamkin*, *supra*, at 144-145, italics omitted.)

The teaser trailer for *Q-Force* and the related still image are advertisements for the show, and they too are protected activity as "merely . . . adjunct[s] to the exhibition of the [television show]." (*Guglielmi v. Spelling-Goldberg Productions* (1979) 25 Cal.3d 860, 872 (conc. opn. of Bird, C. J.);[6] see also *Polydoros v. Twentieth Century Fox Film Corp.* (1997) 67 Cal.App.4th 318, 325.)  The fact that the teaser trailer was made available on Netflix's YouTube channel, which Vox alleges was monetized, does not alter the nature of the teaser trailer, which advertised only *Q-Force*.  Although Vox argues a viewer would need access to a Netflix subscription to watch *Q-Force*, this does not transmute the teaser's essential nature from a promotion of *Q-Force* into a broader advertisement for Netflix's services because the teaser relates only to the *Q-Force* storyline—Netflix's other offerings are not mentioned.  Nor does Vox's allegation that the YouTube page included links to unrelated merchandise in the Netflix shop somehow convert the *Q-Force* teaser trailer into an advertisement for other products.  (See *Hara v. Netflix, Inc.* (9th

---

[6]    Chief Justice Bird's concurrence was joined by two other justices, and a third justice concurred in the constitutional discussion.  (*Guglielmi*, *supra*, 25 Cal.3d at 862 (conc. opn. of Bird, C. J.), 876 (conc. opn. of Newman, J.).)  Our high court has since cited the concurring opinion with approval.  (*Winter v. DC Comics* (2003) 30 Cal.4th 881, 887-888, 891; *Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 396, fn. 7.)

13

Cir. 2025) 146 F.4th 872, 881, fn. 4 [agreeing with Netflix's argument that banner advertisements for third-party products on its YouTube channel did not "'somehow transform'" the teaser into an advertisement for the products]; see also *Stewart v. Rolling Stone LLC* (2010) 181 Cal.App.4th 664, 686 [proximity of unrelated advertisement to expressive magazine feature did not convert the latter to commercial speech].)

The acts and speech at issue also involve issues of public interest. The public interest need not be widespread to be protected by the anti-SLAPP statute. (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1042; *Tamkin, supra*, 193 Cal.App.4th at 143.) Both the topic of the series and of the particular scene at issue relate to the depiction of LGBTQ individuals in entertainment. This is a matter of ongoing public interest and debate. (See, e.g., *Brodeur v. Atlas Entertainment, Inc.* (2016) 248 Cal.App.4th 665, 675; *Dyer v. Childress*, 147 Cal.App.4th 1273, 1284.) Indeed, the public interest in these topics is demonstrated by the numerous articles and reviews discussing the series that defendants submitted in support of the motion (not to mention the more than 18,000 comments posted on the YouTube page for the teaser trailer as of January 2024).[7]

---

[7] Additionally, "'[i]n general, "[a] public issue is implicated if the subject of the statement or activity underlying the claim . . . was a person or entity in the public eye."'" [Citations.]" (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1254.) Vox alleges she is a "well-known" drag queen in Hollywood and/or West Hollywood, where she hosts a series of events. In this particular context, this is sufficient to qualify as being a person "in the public eye."

14

Vox nonetheless contends there is no public interest "in a fictional story about gay spies" and that "there is no matter of public interest to include Plaintiff's image and character in the Series and prominently in the Advertisements . . . ." The alleged inclusion of Vox's drag persona in a scene featuring drag queens in West Hollywood serves Liedman's stated purpose of grounding the series in reality, a decision related to the series' depiction of the LGBTQ community. There can be no real dispute that the public is interested in the depiction of the LGBTQ community in entertainment, whether in a fictional story about gay spies or otherwise. Moreover, defendants' evidence, including the articles covering the series and the screenshot revealing the number of comments on the teaser trailer, demonstrates the public was in fact interested in the series.[8]

### B. *Vox Cannot Demonstrate a Probability of Prevailing*

As previously discussed, Vox asserted three causes of action in her complaint: violation of the statutory right of publicity (Civ. Code, § 3344); violation of the common law right of publicity, and invasion of privacy by appropriation. First Amendment

---

[8] Vox's reliance on *Musero*, *supra*, 72 Cal.App.5th 802, to urge the contrary conclusion is unpersuasive. In *Musero*, the Court of Appeal determined the creative aspects of a work that were allegedly misappropriated following a *private* communication did not contribute to the discussion of the issue of public interest identified, namely the creation and production of a television pilot about Eric Holder. (*Id.* at 821-822.) Here, in contrast, Vox is a self-described public figure in the drag community, and the alleged use of her likeness was presented to the *public* via the *Q-Force* series and its advertisements.

15

protection may be a defense to all of these claims, statutory and common law alike.[9] (*De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 860-861.)

"The freedom of expression protected by the First Amendment exists to preserve an uninhibited marketplace of ideas and to further individual rights of self-expression. [Citation.]  The protections may extend to all forms of expression, including written and spoken words (fact or fiction), music, films, paintings, and entertainment, whether or not sold for a profit." (*Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 57-58, fn. omitted.)

The use of real people in fiction is generally protected by the First Amendment, for good reason.  "Fiction writers may be able to more persuasively, or more accurately, express themselves by weaving into the tale persons or events familiar to their readers.  The choice is theirs.  No author should be forced into creating mythological worlds or characters wholly divorced from reality." (*Guglielmi*, *supra*, 25 Cal.3d at 869 (conc. opn. of Bird, C. J.).)  A celebrity's "right of publicity[, on the other hand,] is essentially an economic right . . . . to prevent others from misappropriating the economic value generated by the celebrity's fame through the merchandising of the 'name, voice, signature, photograph, or likeness' of the celebrity.  [Citation.]" (*Comedy*

---

[9]     As our colleagues in Division Three discussed in *De Havilland*, *supra*, 21 Cal.App.5th 845, it is unclear if the portrayal of "a real person in a television program (or a book, play, or film) constitutes the 'use' of that person's name or 'likeness' 'on or in' a product, merchandise, or good."  (*Id.* at 857.) For purposes of this analysis, we assume without deciding that such a portrayal is a "use" for purposes of the right of publicity.

16

*III, supra,* 25 Cal.4th at 403.)  Thus, "[a]n obvious tension exists between this right of publicity and the First Amendment to the United States Constitution."  (*Winter, supra,* 30 Cal.4th at 885.)

To grapple with this tension, our Supreme Court formulated "what is essentially a balancing test between the First Amendment and the right of publicity . . . ."  (*Comedy III, supra*, 25 Cal.4th at 391.)  The test aids in determining "whether a work merely appropriates a celebrity's economic value, and thus is not entitled to First Amendment protection, or has been transformed into a creative product that the First Amendment protects."  (*Winter, supra*, 30 Cal.4th at 888.)  In other words, "the inquiry is whether the celebrity likeness is one of the 'raw materials' from which an original work is synthesized, or whether the depiction or imitation of the celebrity is the very sum and substance of the work in question."  (*Comedy III, supra*, at 406.)  For use in particularly close cases, our Supreme Court has also articulated "a subsidiary inquiry" that asks: "does the marketability and economic value of the challenged work derive primarily from the fame of the celebrity depicted?"  (*Id*. at 407.)  "If this question is answered in the negative, then there would generally be no actionable right of publicity.  When the value of the work comes principally from some source other than the fame of the celebrity—from the creativity, skill, and reputation of the artist—it may be presumed that sufficient transformative elements are present to warrant First Amendment protection."  (*Ibid*.)

In *Comedy III*, the test was applied to lithographs and t-shirts bearing a hand-drawn likeness of The Three Stooges.  Our high court concluded the artist's skill in drawing the likeness was "manifestly subordinated to the overall goal of creating literal,

17

conventional depictions of The Three Stooges so as to exploit their fame" and therefore was not protected by the First Amendment.[10] (*Comedy III*, *supra* 25 Cal.4th at 409.) In *Winter*, our Supreme Court applied the *Comedy III* test to a comic book that allegedly used the likenesses of two musicians. The comic book characters, which were depicted as half-human and half-worm, had similar names, were drawn with features similar to the musicians' features, and one wore a tall black top hat similar to a hat his alleged real-life counterpart often wore. (*Winter*, *supra*, 30 Cal.4th at 886, 890.) Our high court determined the depictions were "not just conventional depictions of plaintiffs but contain[ed] significant expressive content other than plaintiffs' mere likenesses" and that the plaintiffs were "merely part of the raw materials from which the comic books were synthesized." (*Id.* at 890.) It emphasized the characters were "but cartoon characters . . . in a larger story, which is itself quite expressive." (*Ibid.*) The court also determined the characters and their portrayals did not greatly threaten the plaintiffs' right of

<hr>

[10] At least one court has questioned whether the *Comedy III* test should be applied outside of its original context of "'merchandising'" a celebrity's image. (*De Havilland*, *supra*, 21 Cal.App.5th at 863 ["*Comedy III*'s 'transformative' test makes sense when applied to products and merchandise . . . . [Citation.] Lower courts have struggled mightily, however, to figure out how to apply it to expressive works such as films, plays, and television programs"].) While we agree the description of the test as one that weighs whether a use is "transformative" is not as well suited to the analysis of whether a film or television show is protected by the First Amendment, we nevertheless conclude the principles expressed by *Comedy III* can be applied to the case at hand with relative ease.

publicity because fans of the plaintiffs who wanted pictures of them would find the drawings unsatisfactory as a substitute for conventional depictions.  (*Ibid.*)

Applying the *Comedy III* test here, informed by our Supreme Court's analysis in *Winter,* we conclude the First Amendment forecloses any possibility of liability for defendants' actions identified in the complaint.  We agree the background character allegedly based upon Vox does bear some resemblance to the photograph of Vox included in her complaint.  There are no fantastical elements that undermine the resemblance, like the half-worm depiction of the musicians in *Winter*, but the resemblance alone is not enough under the *Comedy III* test because the remaining considerations point in favor of First Amendment protection.

Just as the alleged likenesses of the musicians in *Winter* were not the sum total of the comic books in which they were portrayed, Vox's alleged likeness is not the sum total of *Q-Force*—or even of the scene in which it is included.  In the scene, the character that is the alleged likeness of Vox is seated with four other drag queens, and they are described as having a union meeting.  Vox's alleged inclusion at most grounds the scene in some semblance of reality, and the character plays a role in what is meant to be a comedic moment.  Vox's own allegation, that the "use of [her] likeness depicts her as an unspeaking background character whose sole role is to perform a fan 'thworp' as a punchline to another character's joke, thus reducing her . . . to a mere element of the setting, a part of the furniture," underscores this point.  The character is, effectively, part of the setting, and is part of what makes the setting feel more real.  The alleged use of her likeness is thus "one of the 'raw materials' from which an

19

original work [was] synthesized . . . ." (*Comedy III*, *supra*, 25 Cal.4th at 406.) The character is a small part of the larger story, "which is itself quite expressive." (*Winter*, *supra*, 30 Cal.4th at 890.) In other words, the likeness was transformed into part of a greater creative product. (*Id.* at 888-889.)

Moreover, even if we were to consider this a "close case[ ]," warranting use of the "subsidiary inquiry" described by *Comedy III*, *supra*, 25 Cal.4th at page 407, that inquiry too would support finding the complained-of conduct immunized by the First Amendment. The subsidiary inquiry asks whether "the marketability and economic value of the challenged work derive[s] primarily from the fame of the celebrity depicted" (*Ibid.*), and here it does not. Vox appears in less than one minute of one episode of a 10-episode series. The marketability and economic value of *Q-Force* cannot be said to "derive primarily" from Vox's renown. Vox's argument that the character resembling her is nonetheless featured prominently at the beginning of the teaser trailer for *Q-Force* and in a still distributed to at least one media publication does not warrant a different conclusion. Anyone who watched the *Q-Force* teaser trailer would quickly realize the character is neither central to the story nor a reason to watch the show, as she does not reappear at any later points in the teaser trailer.

Vox, however, generally asserts the First Amendment does not provide a defense to a right of publicity claim where the defendant appropriates the economic value a plaintiff has built in an identity or performance. She maintains *Comedy III* provides no defense to defendants who simply recreate a public figure's likeness in the setting in which they have achieved renown. But that is not what happened here. *Q-Force* did not duplicate one of

Vox's acts or otherwise replicate her in a way that would substitute for one of her performances with her drag band, or one of her hosted events. Rather, it used her alleged likeness as a background character to ground the West Hollywood setting of the episode. Vox does not allege she is "well-known" because she sits in bars with other drag queens or because she attends drag queen union meetings. Rather, she alleges she is well-known for hosting VIP events and appearing in her drag band. That the background character in *Q-Force* appears in a West Hollywood bar does not make the alleged use of Vox's likeness one that appropriates the economic value she stands to generate from her character or reputation. This distinguishes two cases upon which Vox relies for this argument, *No Doubt v. Activision Publishing, Inc.* (2011) 192 Cal.App.4th 1018, 1023 and *Keller v. Electronic Arts, Inc. (In re NCAA Student-Athlete Name & Likeness Licensing Litigation)* (9th Cir. 2013) 724 F.3d 1268, 1276, as both are cases in which First Amendment defenses were rejected where video game developers used plaintiffs' likenesses in video games to perform the same activity for which they were known in real life.

Vox also argues defendants' use of her likeness "for the purpose of gaining attention" is not expressive and thus does not warrant First Amendment protection. As our high court explained in *Winter*, however, an allegation "that defendants were trading on plaintiffs' likenesses and reputations to generate interest . . . and increase sales" is "irrelevant to whether the [works] are constitutionally protected." (*Winter*, *supra*, 30 Cal.4th at 891.) Rather, "[t]he question is whether the work is transformative, not how it is marketed" (*ibid.*), and we have answered the former question in the affirmative.

Because we conclude Vox cannot demonstrate minimal merit in light of First Amendment protection from liability, we need not and do not address defendants' arguments that Vox did not make a minimal merit showing of actual malice or of more than incidental use.

## DISPOSITION

The order denying the motion to strike is reversed.  The trial court is directed to enter a new and different order granting the motion.  Defendants are awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


HOFFSTADT, P. J.


KUMAR, J.[*]

---

[*]	Retired Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.